James B. **EISENHART** and Sharon L. Eisenhart, Appellants,

v.

Duane E. **SCHREIMANN**, Successor Trustee, and Great Southern Savings Bank, Respondents.

No. 19321.

Missouri Court of Appeals, Southern District, Division Two.

Nov. 1, 1994.

Motion for Rehearing or Transfer to Supreme Court Denied Nov. 28, 1994.

Application to Transfer Denied Jan. 24, 1995.

Lynn C. Rodgers, Hall, Ansley, Rodgers & Condry, Springfield, for appellants.

Charles E. McElyea, Phillips, McElyea, Walker & Carpenter, P.C., Camdenton, for respondents.

CROW, Judge.

By warranty deed signed October 4, 1990, M.J. Moorhead Development, Inc. ("MJMD") conveyed Lot 8 in St. Tropez, a subdivision in Camden County, to James B. Eisenhart and Sharon L. Eisenhart. The Eisenharts thereafter built a home on Lot 8 which, according to Mr. Eisenhart, made the property worth over $400,000.

In July, 1992, Great Southern Savings Bank ("Great Southern") notified the Eisenharts that (a) Lot 8 was subject to a deed of trust in its favor, securing a note from MJMD payable to Great Southern, (b) the note was delinquent, and (c) Great Southern intended to foreclose.

The Eisenharts ("Plaintiffs") commenced this action against the successor trustee and Great Southern ("Defendants"), seeking sundry relief including an injunction barring

foreclosure. A non-jury trial resulted in a judgment for Defendants.

Plaintiffs appeal. Discussion of their three points relied on requires an account of the pertinent facts. Because some details are undeveloped in the record, our narrative is, in certain respects, unavoidably vague.

On April 14, 1989, Michael J. Moorhead and Randa L. Moorhead signed a note payable to Darwin O. Nichols, secured by a deed of trust on several lots in St. Tropez and other "unplatted" land. The deed of trust was recorded April 20, 1989.

On some later date unrevealed by the record, the Moorheads deeded the land covered by the Nichols deed of trust to MJMD.

On September 19, 1990, MJMD made a $200,000 note payable to Great Southern. It called for interest to be paid monthly, beginning October 19, 1990, and for payment in full of all principal and interest on September 19, 1991. MJMD secured the note by a deed of trust on several lots in St. Tropez—including Lot 8—together with other "unplatted" land. The parties agree that most, if not all, of the land covered by that deed of trust was already subject to the Nichols deed of trust; therefore, Great Southern's deed of trust was a "second." Great Southern's deed of trust was filed for record September 26, 1990. We henceforth refer to this $200,000 loan as "the development loan."

At the closing of the development loan, representatives of Great Southern and MJMD signed a separate document (Exhibit 7) stating:

"Great Southern ... will accept the sum of $5,000.00 to be applied to the principal balance of the indebtedness to [MJMD] as a per lot release fee for the St. Tropez development."

As reported earlier, MJMD deeded Lot 8 to Plaintiffs October 4, 1990. It is inferable that Lot 8 was subject to the Nichols deed of trust, inasmuch as the "Settlement Statement" for the sale of Lot 8 by MJMD to Plaintiffs shows $18,480 was withheld from the money due MJMD and applied to "Payoff of first mortgage loan/Nichols." We surmise Lot 8 was thereupon released from the Nichols deed of trust. The deed from MJMD to Plaintiffs warranted the title to Lot 8 and made no mention of Great Southern's lien.

Although the specifics do not appear in the record, the parties agree that in addition to the development loan, MJMD obtained a "construction loan" from Great Southern to finance the building of a house on Lot 21 in St. Tropez, and another such loan to finance construction of a house on Lot 28 in St. Tropez. Each construction loan was secured by a deed of trust on the lot to which it pertained. We are told in Defendants' brief that the construction loan on Lot 28 antedated the development loan, hence we infer Lot 28 was never subject to the lien securing the development loan. As appears *infra,* Lot 21 (the other lot on which Great Southern made a construction loan) was originally subject to the lien securing the development loan.

On March 21, 1991, MJMD paid Great Southern $7,624.83 interest on the development loan.

On April 19, 1991, MJMD paid Great Southern $5,000, and Great Southern released Lot 21 in St. Tropez from the lien securing the development loan. Lot 21, it will recalled, was one of the two lots on which MJMD obtained a construction loan from Great Southern. When Great Southern released Lot 21 from the lien securing the development loan, interest was due from MJMD on that loan.

On April 29, 1991, MJMD paid Great Southern $3,328.28 interest on the development loan. That same day, MJMD paid Great Southern $5,000 more, and Great Southern released Lot 13 in St. Tropez from the lien securing the development loan.

On June 20, 1991, MJMD paid Great Southern $5,000, and Great Southern released Lot 10 in St. Tropez from the lien securing the development loan. At that time, interest was "past due" on the development loan.

On June 29, 1991, MJMD paid Great Southern $1,658.54 interest on the development loan.

On September 19, 1991, the principal on the development loan became due. Interest

was already in arrears. MJMD paid nothing.

On dates unrevealed by the record, the construction loans on Lots 21 and 28 went into default. The deeds of trust securing those loans were foreclosed in November, 1991. At that time, a partially completed house sat on each lot. At the foreclosure sale, Great Southern bid $82,800 on Lot 21 and $109,044 on Lot 28. Each bid was the amount disbursed by Great Southern from the respective construction loan, plus accrued interest. The trustee accepted each bid and deeded Lots 21 and 28 to Great Southern.

By March, 1992, the note signed by the Moorheads April 14, 1989, payable to Darwin O. Nichols was in default. The successor trustee of the deed of trust securing that note commenced publication of notice that the property subject to that deed of trust would be sold at foreclosure May 7, 1992.

The sale took place as scheduled. Great Southern bought the land covered by the Nichols deed of trust for $335,000. Lot 8, of course, was not included in the sale. As recounted earlier, Lot 8 had been released from the Nichols deed of trust when Plaintiffs bought Lot 8 from MJMD. Consequently, after foreclosure of the Nichols deed of trust, Lot 8 remained subject to Great Southern's deed of trust securing the development loan.

At the time the Nichols deed of trust was foreclosed, the holder of the note secured by that deed of trust was St. Tropez Investors Group, Inc. ("Investors Group"). The $335,-000 paid by Great Southern at foreclosure exceeded the amount due Investors Group on the note. Consequently, the successor trustee brought an interpleader action in the Circuit Court of Camden County to determine who was entitled to the surplus. The outcome of that action appears *infra.*

In a letter dated December 4, 1992, from their lawyer to Great Southern, Plaintiffs (who had been notified earlier by Great Southern that it intended to foreclose its deed of trust securing the development loan)

"tendered" $5,000 to Great Southern and asked that Great Southern release Lot 8 from that deed of trust. Plaintiffs based their request on the document that had been signed at the time the development loan was closed (Exhibit 7, quoted *supra*), wherein MJMD and Great Southern agreed to $5,000 as a "per lot release fee."

In a letter dated December 7, 1992, Great Southern refused Plaintiffs' request, stating:

"Please be advised that Great Southern had and has no agreement with [Plaintiffs] to release any lots in return for the payment of $5,000.00. Of course, Great Southern will terminate the foreclosure if the remaining balance due on the note is paid."

Plaintiffs thereupon instituted this action by filing a seven-count petition and an application for a temporary restraining order barring Great Southern from proceeding with the foreclosure sale, scheduled December 16, 1992. The trial court, upon the posting of a $20,000 cash bond by Plaintiffs, granted the restraining order.

On January 12, 1993, the Circuit Court of Camden County entered judgment in the interpleader action brought by the successor trustee of the Nichols deed of trust. That judgment declared: (a) $301,255.18 of the $335,000 paid by Great Southern at the foreclosure sale was due Investors Group and the successor trustee of the Nichols deed of trust, leaving a surplus of $33,744.82, and (b) the amount owed Great Southern by MJMD on the development loan exceeded $200,000. The judgment awarded Great Southern the $33,744.82 surplus. Great Southern applied the surplus against the debt of MJMD on the development loan.[1]

The instant case was tried September 27, 1993. Great Southern presented evidence that the unpaid principal and interest on the development loan (after applying the sum received from the interpleader action) totaled $194,824.59. Additionally, Great Southern claimed attorney fees of $5,250 had accumulated.

---

1. The trial court in the instant case found Great Southern actually received only $32,367.80 from the interpleader action (an amount shown on one of Great Southern's exhibits). The $1,377.02

shortage is unexplained in the record. We surmise that amount may have gone for attorney fees and costs in the interpleader action.

Count III of Plaintiffs' petition prayed the trial court to direct Defendants to:

" . . . marshal the assets available to it [sic], liquidate same and apply the proceeds of same to the Promissory Note secured by the Deed of Trust now being asserted by defendants prior to making any attempted foreclosure of such Deed of Trust . . . ."

In support of that prayer, Plaintiffs presented evidence that the property purchased by Great Southern at foreclosure of the Nichols deed of trust comprised 17 lots and 22.3 acres of "unplatted" land. Some two months before the foreclosure sale, an appraiser valued the 17 lots, in the aggregate, at $291,600, and the "unplatted" land at $450,000.

Plaintiffs also presented evidence that Great Southern had completed the houses that were under construction on Lots 21 and 28 when the construction loans on those lots were foreclosed. As we understand the evidence, Great Southern spent some $36,000 to complete the house on Lot 21 and some $20,500 to complete the house on Lot 28.

Lot 21 (house and land) had been appraised at $160,000. The $36,000 Great Southern spent to finish the house, plus the $82,800 Great Southern successfully bid for Lot 21 at the construction loan foreclosure, gave Great Southern an investment of some $118,800 in Lot 21.

Lot 28 (house and land) had been appraised at $186,200. The $20,500 Great Southern spent to finish the house, plus the $109,044 Great Southern successfully bid for Lot 28 at the construction loan foreclosure, gave Great Southern an investment of some $129,544 in Lot 28.

At time of trial, St. Tropez subdivision was "not quite complete." Streets were yet to be curbed and paved, a guard house was yet to be built, and work remained on a clubhouse, swimming pool and tennis courts. Great Southern had spent about $100,000 on those projects, and expected to spend $40,000 more. When those projects were completed, it was Great Southern's intent to sell everything it owned in St. Tropez.

Plaintiffs maintained in the trial court that if Great Southern, before foreclosing on Lot 8, sold everything it owned in St. Tropez at the appraised value, Great Southern would recover more than it had loaned and spent on St. Tropez. Therefore, argued Plaintiffs, the trial court should require Great Southern to liquidate all its St. Tropez property before foreclosing on Lot 8.

The trial court, as we have seen, denied all relief sought by Plaintiffs. Additionally, the trial court dissolved the temporary restraining order. However, in connection with this appeal, Plaintiffs posted a supersedeas bond; consequently, Defendants have not resumed their effort to foreclose on Lot 8.

█ Plaintiffs' first point relied on asserts the trial court erred in refusing to order Defendants to marshal assets as prayed for by Plaintiffs in Count III. As we understand the argument following Plaintiffs' first point, their position is: (1) Great Southern should be required to sell all the property it purchased at foreclosure of the Nichols deed of trust, (2) from the proceeds, Great Southern should reimburse itself for all expenditures in acquiring, improving and selling such property, and (3) Great Southern should apply the remaining proceeds to the debt owed by MJMD on the development loan. Only then, say Plaintiffs, should Great Southern be allowed to foreclose on Lot 8, and then only if an unpaid balance remains on the development loan. Plaintiffs proclaim: "If Great Southern is able to sell the property it acquired at [foreclosure of] the Darwin Nichols deed of trust for an amount greater than the amount it paid to purchase, complete and market the property, and pay the entire amount due under the development loan, it has been made completely whole and should not be entitled to profit . . . at the expense of Plaintiffs."

Plaintiffs cite *State ex rel. Brigance v. Smith*, 345 Mo. 793, 135 S.W.2d 355, 359[10] (banc 1940), for the proposition that equity will assume jurisdiction over mortgages and deeds of trust for determining the priority of their liens, for marshaling the assets of the debtor, and for purposes of foreclosure. In regard to marshaling assets, Plaintiffs cite the following passage from *Tower Grove Bank & Trust Co. v. Duing*, 346 Mo. 896, 144 S.W.2d 69, 72 (1940):

"... where a creditor has a lien on ... two parcels of property, and another creditor has a lien upon but one of them, the former creditor will, in equity, be required to seek satisfaction out of that fund or parcel upon which the other creditor has no lien."

We fail to see how *Brigance* or *Tower Grove* applies here. This is not a case where Great Southern holds a lien on two or more tracts securing one debt, thereby presenting the question of which tract should be sold first. Great Southern has a lien on only one tract—Lot 8.

Great Southern once had a lien on the 17 lots and 22.3 acres of "unplatted" land it now owns. However, that lien was junior to the Nichols deed of trust. The foreclosure on that property was under the Nichols deed of trust, not Great Southern's. Great Southern, mindful that foreclosure of the Nichols deed of trust would extinguish Great Southern's lien, *Brask v. Bank of St. Louis*, 533 S.W.2d 223, 227[6] (Mo.App.1975); *Sipes v. Kansas City Title Insurance Co.*, 372 S.W.2d 478, 479[3] (Mo.App.1963), had the bleak choice of buying the property at the Nichols foreclosure or watching a stranger buy it. Facing that dilemma, Great Southern opted to pay $335,000 and acquire the property. Having done so, Great Southern is no longer a lienholder on that property. The only lien Great Southern holds to secure the development loan is the lien on Lot 8.

■ Furthermore, Plaintiffs are not junior lienholders on Lot 8. They are the owners of Lot 8. Recognizing they are not lienholders, Plaintiffs maintain they are nonetheless creditors of MJMD by reason of the warranties of title in the deed they received from MJMD.

Whether that hypothesis is sound is an issue we need not decide. Even if Plaintiffs are creditors of MJMD, they are only unsecured creditors. In *State ex rel. Fields v. Cryts*, 87 Mo.App. 440 (1901), the court explained:

"It is not the law that a creditor, holding two or more securities for his debt, is compelled to surrender one, in favor of an unsecured creditor, even though the one left is ample to pay his debt. The doctrine of marshalling assets is an equitable one and can only be invoked at the instance of a creditor holding a junior mortgage.

.     .     .     .     .

A creditor, having two or more different mortgages on different property as to unsecured creditors, has the right to resort to which of his mortgages he will, one or more or all of them for the payment of his debt. Unsecured creditors have a right to any surplus that may remain over, after the payment of the secured debt, but not the right to force the secured creditor to rely on any particular security or securities he has and to release the others to them."

*Id.* at 448, 449–50.

Obviously, the facts here do not fit the doctrine of marshaling assets.

Beyond that, when property is sold at foreclosure, the price is fixed by auction, hence the amount received by the creditor to be applied against the debt can be instantly and precisely calculated.

That would not be so in the scenario championed by Plaintiffs. The amount to be credited against the debt of MJMD on the development loan could not be calculated for months—perhaps years. To calculate it, Great Southern would have to (a) sell every square inch of property it acquired at the Nichols foreclosure, (b) account for every penny expended by it in acquiring, improving and selling such property, and (c) deduct the total outlay from the aggregate sale proceeds. Obviously, those tasks would require substantial time and effort by employees of Great Southern. The extent to which the salaries of those employees for that work should be included in the calculation is unexplained by Plaintiffs. However, Plaintiffs concede: "An accounting would be necessary to determine the actual amount of the expenses incurred by Great Southern in the completion and sale of the subdivision, the price received for the property, the reasonableness of the sale of the property, and the amount of the reduction to the development loan, if any, to which Plaintiffs are entitled." We suspect the accounting would produce its

own flourishing crop of issues, to be resolved by future litigation.[2]

According to Plaintiffs, only after all of that, and only if an unpaid balance then remained on the development loan, would Great Southern be allowed to foreclose on Lot 8. Such a torturous process is a wholly different exercise than merely requiring a secured creditor to foreclose one of two deeds of trust before foreclosing the other.

Plaintiffs cite no authority demonstrating they are entitled to the elaborate relief described in their first point. The facts in *Siesta Manor, Inc. v. Community Federal Savings and Loan Association,* 716 S.W.2d 835 (Mo.App.E.D.1986), cited by Plaintiffs, are far different than those here.

In *Siesta Manor,* a lender made a loan secured by a deed of trust on land. The borrower defaulted on the loan, and the land was sold at foreclosure. The lender was the successful bidder at $285,000. The lender later sold the land for $600,000. In the meantime, the lender had received $185,000 from the escrowee of the loan in settlement of a suit brought by the lender against the escrowee. The borrower was not a party to that suit. The lender credited the $185,000 against the borrower's debt on the date of the foreclosure sale.

The borrower in *Siesta Manor* eventually sued the lender in St. Louis County for damages. While that suit was pending, the borrower sued the lender in Jefferson County to set aside the foreclosure sale. The trial court in Jefferson County found the foreclosure sale inequitable, but refused to set it aside because portions of the land had been transferred to various third parties. The trial court in Jefferson County nonetheless ordered the lender to credit the borrower with the $600,000 the lender received when it sold the land, subject to any valid claims of the lender against the borrower. An accounting resulted in a determination that the borrower was entitled to $99,195 plus interest from the lender. Both sides appealed. The lender failed to post a supersedeas bond, so the borrower executed on the judgment, whereupon the lender paid the amount due.

That resulted in a dismissal of the borrower's appeal (and, we infer, also the lender's).

The lender in *Siesta Manor* then moved the trial court in the St. Louis County suit to dismiss it. The trial court did. The borrower appealed. The appellate court held the St. Louis County suit was barred by res judicata, 716 S.W.2d at 840, inasmuch as the facts upon which the trial court in Jefferson County based its finding that the foreclosure sale was inequitable were the same facts on which the borrower based its claim for damages in the St. Louis County suit. *Id.*

*Siesta Manor* supplies no precedent for Plaintiffs. The appellate court there was not required to decide whether the trial court in Jefferson County was correct in the procedure it followed or the result it reached. Furthermore, *Siesta Manor* did not involve marshaling of assets. There were no multiple liens securing one debt and no junior lienholders. Finally, the litigation in *Siesta Manor* was between borrower and lender, and there was no issue about whether a foreclosure sale should be postponed pending an accounting. The accounting in *Siesta Manor* occurred long after foreclosure. *Siesta Manor* is inapplicable here.

One further reason exists for denying Plaintiffs' first point. As noted earlier, Great Southern recorded its deed of trust September 26, 1990, prior to the sale of Lot 8 by MJMD to Plaintiffs October 4, 1990. Notice of Great Southern's lien was therefore imputed to Plaintiffs at the time the sale of Lot 8 was closed. §§ 442.380–.390, RSMo 1986; *Smith v. Boyd,* 162 Mo. 146, 62 S.W. 439, 440–41 (1901); *Bremen Bank and Trust Co. v. Muskopf,* 817 S.W.2d 602, 608[9] (Mo.App. E.D.1991).

■ The doctrine of marshaling assets is an equitable one. *Fields,* 87 Mo.App. at 448. Plaintiffs allege no improper or careless conduct by Great Southern, yet Plaintiffs seek to shift to Great Southern the consequences of Plaintiffs' failure to require MJMD to provide them a release of Lot 8 from Great Southern's lien at time of closing. Plaintiffs present no justification for requiring Great

**2.** Plaintiffs' brief declares, "[I]t is clear ... that this is [a case] involving a complicated account."

Southern to bear the burden of Plaintiffs' (or their title insurer's[3]) oversight.

Plaintiffs' first point is denied.

■ Plaintiffs' second point asserts the trial court erred in denying Count I of their petition, which sought an accounting of the amount due Great Southern by MJMD on the development loan and Great Southern's outlay in acquiring, improving and selling the property it purchased at foreclosure of the Nichols deed of trust.

As we grasp Plaintiffs' second point, their prayer for an accounting in the trial court hinged on their receiving the relief they characterized as "marshaling of assets." Inasmuch as we have held Plaintiffs are not entitled to the latter relief, their second point is moot.

■ Plaintiffs' third point assigns error in the trial court's denial of the relief Plaintiffs sought in Count IV of their petition. In that count, Plaintiffs sought an order compelling Great Southern to release its lien on Lot 8 upon payment by Plaintiffs of $5,000. Plaintiffs based Count IV on Exhibit 7, quoted *supra*, the document wherein Great Southern agreed to accept $5,000 as a "per lot release fee."

The trial court ruled that the right to obtain a release of individual lots for $5,000 could be enforced only so long as the development loan was not in default. Plaintiffs assert that ruling was an erroneous declaration and application of the law. Plaintiffs cite *Chicago Title Insurance Co. v. First Missouri Bank of Jefferson County*, 622 S.W.2d 706 (Mo.App.E.D.1981), although they concede it is "not precisely on point."

In *Chicago Title*, two builders bought land with a loan from a bank, secured by a deed of trust on the land. The bank agreed to release individual lots from its lien for $5,500. The builders thereafter sought a construction loan on Lot 91 from a savings and loan association ("S & L"). The S & L and its title insurer engaged an agent to handle the transaction. The agent phoned the bank and

was told Lot 91 would be released for $5,500. At the time of that call, the builders' loan at the bank was in default. The agent tendered the bank a $5,500 check, paid $19,500 in construction expenses, and committed the title insurance company to insure that the S & L would receive a first deed of trust on Lot 91. Some three weeks later, the bank returned the $5,500 check and announced plans to foreclose on Lot 91 and other land. The trial court enjoined the bank from foreclosing on Lot 91. Applying the doctrine of estoppel, the appellate court affirmed, holding the bank could not induce $19,500 in expenditures on Lot 91, then repudiate the release agreement and take a windfall. *Id.* at 708.

Unlike the bank in *Chicago Title*, Great Southern never told Plaintiffs it would release Lot 8 from its lien upon payment of any amount. Indeed, Plaintiffs concede in their brief that they were unaware of Great Southern's lien and the $5,000 "per lot release fee" proviso when they bought Lot 8 from MJMD.

Defendants, unable to cite any Missouri case on point, refer us to *Gerber v. Karr*, 231 Md. 180, 189 A.2d 353 (1963), as authority for the proposition that absent an agreement in the mortgage to the contrary, a vendee of a mortgagor cannot obtain a release of a portion of the mortgaged land after default by the mortgagor on its obligations under the mortgage. However, as Plaintiffs point out, the deed of trust in *Gerber* allowed the mortgagor to obtain a release of part of the mortgaged land "until default in any condition of this deed of trust or of the note *but not thereafter*." (Emphasis added.) No such restriction appears in Exhibit 7, and Defendants do not identify any such restriction in the note or deed of trust signed by MJMD.

Cases pertinent to Plaintiffs' third point are collected in the J.R. Kemper annotation, *Construction of Provision in Real Estate Mortgage, Land Contract, or Other Security Instrument for Release of Separate Parcels of Land as Payments Are Made*, 41 A.L.R.3d 7, 67–109 (1972). The annotation points out that the cases essentially hinge on construc-

---

3. Attached to a stipulation presented to the trial court was a copy of a policy of title insurance on

Lot 8 naming Plaintiffs as insureds.

tion of the particular language of a partial release provision in the security instrument, executed as part of a particular transaction with its own set of circumstances. *Id.* at 67. We shall therefore examine the relevant circumstances here.

As emphasized by Defendants, Exhibit 7 was signed by representatives of MJMD and Great Southern. Plaintiffs were not parties to Exhibit 7. Defendants maintain Plaintiffs cannot, therefore, enforce Exhibit 7.

Plaintiffs insist they stand in MJMD's shoes by reason of their warranty deed from MJMD, hence they possess MJMD's rights under Exhibit 7.

We need not resolve that issue in adjudicating Plaintiffs' third point. We shall assume, without deciding, that if MJMD had the right to a release of Lot 8 from Great Southern's lien on December 4, 1992, by tendering $5,000 to Great Southern, Plaintiffs had the same right.

Plaintiffs insist MJMD had such a right. Plaintiffs assert Great Southern released its lien on three lots (Lots 21, 13 and 10, mentioned *supra*) when MJMD was delinquent in paying interest on the development loan. However, as underscored by Defendants, those three lots were released before the $200,000 principal became due September 19, 1991. Great Southern released no lot from its lien after June 20, 1991.

Plaintiffs did not tender the $5,000 to Great Southern until December 4, 1992. By then, MJMD had been in default on the $200,000 principal on the development loan for over 14 months. Additionally, the land upon which Great Southern held a lien as security for the development loan had (except Lot 8) been sold at foreclosure of the senior encumbrance—the Nichols deed of trust—May 7, 1992. Great Southern, faced with extinction of its security, had chosen to pour another $335,000 into St. Tropez.

Being left with only Lot 8 as security for the unpaid development loan (including accrued interest), Great Southern undertook

foreclosure on Lot 8. When Plaintiffs tendered $5,000 on December 4, 1992, Defendants had already commenced publication of notice that Lot 8 would be sold at foreclosure December 16, 1992.[4]

In *Rolfes v. O'Connor,* 844 P.2d 1330 (Colo. App.1992), a delinquent borrower, after the lender commenced publication of notice of foreclosure sale, sought to invoke a provision in the deed of trust for release of individual parcels of the land being foreclosed. He tendered money two days before the sale. The lender refused the money and proceeded with the sale. The borrower sued to set the sale aside. The trial court denied relief. The appellate court affirmed, stating some courts have held that once the entire note becomes payable, the right to partial releases is terminated. *Id.* at 1333. The rationale is that the duty to issue partial releases is impliedly conditioned upon the borrower's compliance with the general payment schedule, even in the absence of a specific provision to that effect. *Id.*

Emphasizing that a party seeking specific performance of a contract must not be guilty of the first substantial breach, and that when the borrower made his tender he failed to offer any unpaid interest on the amount tendered, *Rolfes* held that as a matter of law the borrower failed to do equity and was consequently barred from equitable relief. *Id.* at 1333–34.

Plaintiffs acknowledge in their brief that the purpose of the $5,000 "per lot release fee" agreement was to enable MJMD, the developer of St. Tropez, to sell lots to home buyers as the development of St. Tropez advanced. When Plaintiffs tendered the $5,000 on December 4, 1992, MJMD was no longer developing St. Tropez. All of the land MJMD had owned in St. Tropez had been taken from MJMD May 7, 1992, when the Nichols deed of trust was foreclosed. Consequently, the reason for the $5,000 "per lot release fee" no longer existed after that date.

Applying the rationale of *Rolfes,* 844 P.2d at 1333–34, we hold MJMD, having (a) lost

---

4. Although we find nothing in the record showing the date of first publication of notice of the foreclosure sale, the trial court found foreclosure proceedings had begun before Plaintiffs tendered the $5,000. That finding is unchallenged. By reason of § 443.320, RSMo 1986, publication would have had to begin before December 4, 1992.

St. Tropez upon foreclosure of the Nichols deed of trust, (b) defaulted on the $200,000 principal on the development loan, and (c) paid no interest on the development loan after June 29, 1991, had no right to a release of Lot 8 from Great Southern's lien upon tender of $5,000 December 4, 1992. Plaintiffs claim no greater rights than those of MJMD against Great Southern. Consequently, we deny Plaintiffs' third point.

Assuming Defendants now proceed with foreclosure on Lot 8, we recognize it is possible that when Great Southern ends its St. Tropez adventure by selling the last of its holdings,[5] it may end up with a sum exceeding its outlay and uncollected interest in St. Tropez. If, as a consequence, Plaintiffs assert a claim against Great Southern for the excess, we express no opinion on whether such a claim would be barred by res judicata. That question, along with the merits of such a claim, can be adjudicated at the appropriate time.

Judgment affirmed.

GARRISON, P.J., and PREWITT, J., concur.

---

5. Citing § 362.165, RSMo 1986, Plaintiffs assert Great Southern must "sell any real estate acquired within six . . . years of the date of acquisition."