Darrel W. MELSON, et
al., Respondents,

v.

Carl T. TRAXLER, et al., Appellants.

No. WD 72795.

Missouri Court of Appeals,
Western District.

Nov. 1, 2011.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 20, 2011.

Application for Transfer
Denied Jan. 31, 2012.

David L. Knight, Columbia, MO and Susan Ford Robertson, Kansas City, MO, for appellants.

John Hein, St. Louis, MO, for respondents.

Before Division Two: MARK D. PFEIFFER, Presiding Judge, VICTOR C. HOWARD, Judge and CYNTHIA L. MARTIN, Judge.

CYNTHIA L. MARTIN, Judge.

Carl and Martha Traxler (collectively "the Traxlers") and David Knight ("Knight") appeal from the trial court's grant of summary judgment in favor of Darrel and Mellony Melson (collectively "the Melsons") and First National Bank and Trust Company ("First National Bank"). The Traxlers and Knight argue on appeal that the trial court improperly granted summary judgment because the Melsons and First National Bank failed to establish that no material factual disputes existed or that judgment was appropriate as a matter of law. We reverse the trial court's judgment and remand with instructions.

## Undisputed Facts and Procedural History

On May 5, 2000, the Traxlers transferred approximately 94 acres of unimproved land to Keith and Chastity Samuel (collectively "the Samuels"). The Samuels put down $35,000, and the Traxlers provided seller financing for the remaining $388,180 of the purchase price. The terms of the seller-financing agreement were memorialized in a demand promissory note that required the Samuels to make monthly payments of interest. The promissory note was secured by a first deed of trust in favor of the Traxlers on the 94–acre tract. Knight was the Trustee named in the first deed of trust.

The Samuels intended to develop the land into residential lots to be sold to individual homeowners. Toward this end, approximately 38.25 acres of the 94–acre tract was platted as Brookfield Estates, Phase I (hereinafter, "Phase I"). To finance the cost of installing sewer lines, streets, sidewalks, and other infrastructure in Phase I, the Samuels obtained a construction loan from Boone County National Bank ("Boone Bank"). To secure the construction loan, the Samuels were required to grant Boone Bank a first deed of trust on Phase I. The Traxlers agreed to partially release their first deed of trust on Phase I in exchange for a second deed of trust on Phase I.[1] Knight was the Trustee named in the second deed of trust. The Traxlers'

---

1. The second deed of trust was actually granted by Samuel Construction, Limited Liability Company.

second deed of trust was duly recorded in the Boone County Recorder of Deeds office on January 29, 2001. Following this transaction, the Traxlers remained the holders of a first deed of trust on the 94-acre tract (excluding Phase I) and were the holders of a second deed of trust on Phase I. Both deeds of trust secured the Samuels' promissory note.

After obtaining construction financing, the Samuels began to sell residential lots to individual homeowners in Phase I. From December 2001 to September 2004, at least 14 residential lots were sold. In each case, Boone Bank and the Traxlers agreed, *upon contemporaneous request,* to issue partial releases of their respective deeds of trust so that the buyers of each lot took title to their lot free and clear. In connection with two such lot sales in March 2004, however, the Traxlers advised Boone Central Title Company ("Boone Title"), the title company which handled the closings for lots in Phase I, that:

> We want to handle the matter of lot releases on a "per lot" basis. In other words this agreement is only for the release of these two lots. We will make a further decision on releasing additional lots *when a request is made for the same.*

(Emphasis added.)

Sometime in early 2003, the Melsons entered into a contract to purchase a lot in Phase I from the Samuels.[2] First National Bank provided the financing for the Melsons' purchase of the lot and for their anticipated construction of a home on the lot. Prior to closing, Boone Title issued title commitments to the Melsons and to First National Bank. The title commitments showed both Boone Bank's and the Traxlers' Phase I deeds of trust as encumbrances to title. The title commitments reflected Boone Title's agreement to issue the Melsons and First National Bank title insurance policies at closing.

Boone Title also served as the closing agent for the Melsons' lot purchase. Boone Title requested and secured from Boone Bank a partial deed of release of Boone Bank's deed of trust on the Melsons' lot. Inexplicably, Boone Title failed to request or secure a release of the lot from the second deed of trust in favor of the Traxlers. There is no allegation that the Traxlers were aware that the Melsons were acquiring a lot from the Samuels.

The Melsons closed on their lot on May 9, 2003. The Melsons then built a home on their lot.

The Samuels became irregular in the interest payments due on their promissory note to the Traxlers in February 2004 and stopped making any payments in January 2005. In August 2006, Knight, as Trustee, foreclosed the Traxlers' first deed of trust on the land remaining from the original 94-acre tract, which excluded Phase I.[3] The Traxlers' second deed of trust on Phase I was not foreclosed.

In December 2007, Boone Title conducted a routine audit of its files. Boone Title discovered that it had failed to obtain the Traxlers' partial release of their second deed of trust on the Melsons' lot. Boone Title asked the Traxlers to execute a partial deed of release for the Melsons' lot. The Traxlers were unwilling to do so.[4]

2. The Melsons contracted to purchase Lot 14 of Brookfield Estates Plat Two.

3. The portion of land that remained encumbered by the Traxlers' first deed of trust by the time of this foreclosure sale was, apparently, only 21.88 acres.

4. Boone Title's routine audit actually found that Boone Title had failed to secure a release of the Traxlers' deed of trust on two lots sold in Phase I-the Melsons' lot and a second lot.

Instead, they directed Knight to record a notice of deed of trust lien on the Melsons' lot and threatened foreclosure.[5]

The Melsons and First National Bank filed suit against the Traxlers and Knight in an effort to prevent foreclosure.[6] Though the Melsons and First National Bank asserted six theories for recovery, each count relies on the same factual allegations and seeks essentially the same relief.[7] The Melsons and First National Bank contend that the Traxlers, the Samuels, and Boone Bank had a "development plan" reflected not in writing, but by the parties' course of conduct, and that the "development plan" included an agreement by the Traxlers that they would partially release their second deed of trust upon the sale of a lot in Phase 1 so long as the Samuels were not in default on their promissory note. The Melsons and First National Bank thus contend that they have an absolute vested right to the release of the Traxlers' deed of trust from the Melsons' lot because the Samuels' promissory note

was not in default at the time of the Melsons' purchase of the lot and because all conditions precedent for the partial release of the Traxlers' deed of trust were thus satisfied at the time of the Melsons' purchase of the lot.

Following the completion of discovery, the Melsons and First National Bank filed a motion for summary judgment as to all counts asserted in their petition against the Traxlers and Knight.[8] The motion for summary judgment asserted that the uncontroverted facts supported the entry of judgment as a matter of law because the Melsons and First National Bank had a vested right to release of the Traxlers' deed of trust as of the time the Melsons closed on their lot. The trial court granted the motion for summary judgment. The trial court declared that its judgment was final for purposes of appeal and that there was no just reason for delay.

The Traxlers and Knight appeal.[9]

5. The unpaid balance due the Traxlers on the Samuels' promissory note is not established in the record, nor pertinent to the issues on appeal. The amount the Traxlers are owed on the Samuels' promissory note was not the subject of the issues before the trial court and is thus beyond the scope of this opinion.

6. We assume that the lawsuit was initiated on behalf of the Melsons and First National Bank pursuant to the insurers' obligations under the title insurance policies issued to the Melsons and First National Bank.

7. The six counts asserted by the Melsons and First National Bank against the Traxlers and Knight were: declaratory judgment, quiet title, equitable estoppel, promissory estoppel, injunctive relief, and specific performance.

8. The Melsons and First National Bank also filed suit against Samuel Construction, LLC, claiming breach of warranty deed, breach of the covenant to warrant and defend, breach of the covenant of seisin, and breach of the covenant of further assurances. The claims against Samuel Construction were not the

subject of the Melsons' and First National Bank's motion for summary judgment and are not the subject of this appeal.

9. We have a duty to determine *sua sponte* whether we have jurisdiction over the appeal. *West v. Sharp Bonding Agency, Inc.*, 327 S.W.3d 7, 10 n. 5 (Mo.App. W.D.2010). We acquire jurisdiction as soon as the trial court issues a "final judgment." Section 512.020(5). The general rule is that a judgment is final if it disposes of all the issues with regard to all of the parties and leaves nothing for future determination. *Ameriquest Mortgage Co. v. Gehrig*, 245 S.W.3d 239, 241 (Mo.App. W.D.2007). Rule 74.01(b), though, allows an appellate court to have jurisdiction over the appeal if the circuit court "enter[s] a judgment as to one or more but fewer than all of the claims or parties ... upon an express determination that there is no just reason for delay."

Here, the trial court entered a judgment for all of the claims against the Traxlers and Knight and certified the judgment as "final for the purposes of appeal and there is no just

## Standard of Review

"The standard of review when considering an appeal from the grant of summary judgment is essentially *de novo.*" *Renaissance Leasing, LLC v. Vermeer Mfg. Co.,* 322 S.W.3d 112, 119 (Mo. banc 2010) (citing *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993)). "Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Id.* at 119–20 (citing *Larabee v. Eichler,* 271 S.W.3d 542, 545 (Mo. banc 2008); Rule 74.04(c)(6)). "The court accords the non-moving party the benefit of all reasonable inferences in the record." *Id.* at 120 (citing *ITT,* 854 S.W.2d at 376). "[The entry] of summary judgment may be affirmed under any theory that is supported by the record." *Id.* (citing *Burns v. Smith,* 303 S.W.3d 505, 509 (Mo. banc 2010)).

## Analysis

The Traxlers and Knight argue that the trial court erred in granting summary judgment in favor of the Melsons and First National Bank because material facts were still in dispute, namely those relating to whether the Traxlers' course of conduct indicated a binding intent to grant partial releases for every lot sold by the Samuels in Phase I. Alternatively, the Traxlers and Knight argue that, as a matter of law, the Melsons and First National Bank did not have a vested right to a partial release of the Traxlers' deed of trust. Because the uncontroverted facts asserted by the Melsons and First National Bank do not establish that they have a vested right to a partial release of the Traxlers' deed of

reason for delay." The Melsons' and First National Bank's claims against Samuel Construction remain, but those claims do not involve the Traxlers or Knight. As such, we have jurisdiction over this appeal.

trust, we conclude that the trial court erred as a matter of law in entering judgment in favor of the Melsons and First National Bank.

Section 442.390 [10] provides that:

Every ... instrument in writing, certified and recorded in the manner herein prescribed, shall, from time of filing of same with the recorder for record, impart notice to all persons of the contents thereof and all subsequent purchasers and mortgagees shall be deemed, in law and equity, to purchase with notice.

The Traxlers' second deed of trust on Phase I was duly recorded of record with the Boone County Recorder of Deeds office in January 2001, several years before the Melsons bought their lot and before First National Bank extended financing for that purpose. The Melsons thus purchased their lot, and First National Bank agreed to extend financing secured by a deed of trust on the lot, subject to constructive notice of the Traxlers' deed of trust. *See Hamrick v. Herrera,* 744 S.W.2d 458, 461 (Mo.App. W.D.1987) ("It is established by ancient, but viable, authority that a purchaser is bound with constructive notice of all recorded instruments and the recitals therein lying within the chain of title.").

In fact, it is uncontested that the Melsons and First National Bank also had actual notice of the Traxlers' deed of trust before closing, as the Traxlers' interest in the lot was reflected on title commitments issued by Boone Title prior to closing. *See id.* at 461 (holding that where commitment to title insurance made reference to recorded declaration of restrictions, party to

10. All statutory references are to RSMo 2000, as supplemented, unless otherwise indicated.

whom the commitment was issued had actual notice of the restrictions).

■ It is also uncontested that no one asked the Traxlers to release their second deed of trust prior to the Melsons' purchase of a lot. Thus, we need not concern ourselves with what the Traxlers *might* have done had they been contemporaneously asked to execute a partial release prior to the Melsons' closing.[11] That hypothetical inquiry does not alter the fact that, as a matter of law, the Melsons took title to their lot, and First National Bank was granted a deed of trust on the lot, subject to the Traxlers' second deed of trust.

Because the Melsons and First National Bank took subject to the Traxlers' recorded deed of trust, they are charged with notice of, and are bound by, the contents of the deed of trust. *See* section 442.390 (duly recorded documents "impart notice to all persons of the contents thereof"); *Hamrick*, 744 S.W.2d at 461 (duly recorded documents bind purchasers to notice of "the recitals therein"). We look, therefore, to the second deed of trust to determine what it provided with respect to the Traxlers' obligation to fully or partially release the deed of trust. *See Oak Bluff Partners, Inc. v. Meyer*, 3 S.W.3d 777, 781 (Mo. banc 1999) ("The conditions of performance of the deed of trust are according to the integral terms of the debt instrument and the deed of trust."). The resolution of this question hinges on contract interpretation. *See Ringstreet Northcrest Inc. v. Bisanz*, 890 S.W.2d 713 (Mo.App. W.D.1995) (using contract interpretation rules to construe a wrap-around deed of trust's provision regarding its termination).

■ The first step in interpreting the Traxlers' second deed of trust is to "ascertain the intent of the parties by looking at the words of the [deed of trust] and giving those words their plain, ordinary, and usual meaning." *Ethridge v. TierOne Bank*, 226 S.W.3d 127, 131 (Mo. banc 2007). "The 'intent of the parties is determined based on the [deed of trust] alone unless the [deed of trust] is ambiguous.'" *Id.* (quoting *Trimble v. Pracna*, 167 S.W.3d 706, 714 (Mo. banc 2005)). "'Language is ambiguous if it is reasonably open to different constructions.'" *Id.* (quoting *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007)).

■ The Traxlers' second deed of trust provided that the Samuels "desire[d] to provide this Deed of Trust lien [on Phase I] to constitute additional security for [the Samuels' promissory note]." With respect to the subject of its release, the second deed of trust provides:

> Now, if the said Note and interest be paid when same becomes due and payable and the foregoing agreement be faithfully performed, then this Deed shall be void, and [Phase I] hereinbefore conveyed shall be released ... but if default be made in the payment of the Note ... then this deed shall remain in full force, and the TRUSTEE, ... may proceed to sell [Phase I] hereinbefore described, or any part thereof, at public vendue....

11. The Melsons and First National Bank contended that Mr. Traxler testified in a deposition that had he been asked at the time of the Melsons' closing to execute a partial release of the Traxlers' deed of trust, he would have done so. Assuming, *arguendo*, that this was an uncontroverted fact (and it was not), it is a hypothetical fact of no legal relevance. What the Traxlers might have been willing to do prior to the Melsons' closing has no legal effect on the fact that the Melsons and First National Bank acquired their interests in the Melsons' lot subject to the Traxlers' deed of trust by virtue of the constructive notice imparted by section 442.390 and the actual notice imparted by their title commitments.

The Melsons and First National Bank concede that the Traxlers' second deed of trust is unambiguous. The plain, ordinary, and usual meaning of the aforesaid language requires the Traxlers to release the second deed of trust upon **full** payment of the underlying promissory note. The Traxlers' second deed of trust imposes no obligation on the Traxlers to execute partial deeds of release at any time. As noted, *supra*, the Melsons and First National Bank thus acquired their respective interests in the Melsons' lot subject to the knowledge that the Traxlers had no written obligation pursuant to the unambiguous terms of the second deed of trust to execute a partial deed of release for the Melsons' lot, even had the Traxlers been asked to do so prior to the Melsons' closing.

Though they concede the second deed of trust is unambiguous, the Melsons and First National Bank nonetheless argue that the Traxlers' conduct **after** obtaining the second deed of trust has modified the second deed of trust. The Melsons and First National Bank argue that the Traxlers execution of partial deeds of release on 14 Phase I lots modified the second deed of trust to impose an enforceable obligation on the Traxlers to execute partial deeds of release on all lots sold in Phase I so long as the Samuels' promissory note was not in default at the time of the sale. Applied to their situation, the Melsons and First National Bank contend that since the Samuels' note was not in default when the Melsons bought their lot, the Melsons and First National Bank acquired a vested right to the partial release of the Traxlers' deed of trust that could not be divested by the Samuels' subsequent default on their promissory note.

To support their argument, the Melsons and First National Bank rely on two Maryland cases—*Leisure Campground & Country Club L.P. v. Leisure Estates*, 280 Md. 220, 372 A.2d 595 (1977), and *Burroughs v. Garner*, 43 Md.App. 302, 405 A.2d 301 (Md.Ct.Spec.App.1979). In *Leisure Campground,* the Maryland court held that if the **written** conditions in a deed of trust for partial release have been satisfied, the right to partial release is vested. 372 A.2d at 598–99. In *Burroughs,* the court applied the holding of *Leisure Campground* to a situation where the deed of trust **contained provisions** allowing for partial releases. 405 A.2d at 308–09.

The Melsons and First National Bank also rely on *Eisenhart v. Schreimann*, 889 S.W.2d 887 (Mo.App. S.D.1994), describing it as "the sole Missouri case that examines the operation of conditions to the release of individual lots from a deed of trust." In that case, there were two deeds of trust encumbering the property bought by the Eisenharts. *Id.* at 889. The first deed of trust was released, but the second deed of trust was not. *Id.* After the Eisenharts bought their lot, the sellers defaulted on their obligations secured by the second deed of trust. *Id.* at 889–90. The lender informed the Eisenharts that it intended to foreclose on the deed of trust. *Id.* at 890. In response, the Eisenharts tendered $5,000 to the lender and requested a release of the deed of trust, pursuant to the **written** agreement between the lender and the seller. *Id.* That agreement provided that, in exchange for a $5,000 payment per lot, the lender would partially release its deed of trust. *Id.* at 889. The lender refused the Eisenharts' $5,000 payment. *Id.* at 890. The court held that the Eisenharts had no right to a partial release because the $5,000 payment was not made prior to the seller defaulting on its obligations to the lender. *Id.* at 895–96. Had the Eisenharts tendered payment prior to default, they would have been entitled to a

partial release. *Id.* Though the lot purchaser in *Eisenhart* did not prevail, the Melsons and First National Bank contend that *Eisenhart* assists their position because it stands for the proposition that the pre-default satisfaction of conditions to an obligation to execute a partial release creates a vested right to a partial release that is not divested by a subsequent default.

The cases cited by the Melsons and First National Bank are not applicable to the circumstances before us. In both of the Maryland cases, the express terms of the deed of trust obligated the holder of the deed of trust to execute a partial release upon the performance of written conditions. Thus, in both cases, the source of the enforceable "vested right" to insist on a partial release was the language of the relevant deed of trust. Obviously, the Melsons and First National Bank cannot, and do not, rely on language in the Traxlers' second deed of trust as the genesis for their claimed vested right to a partial release. Instead, they argue that the deed of trust was modified by a course of conduct to impose an unwritten duty on the Traxlers to execute partial releases. Neither of the Maryland cases addresses whether conduct engaged in by the holder of a deed of trust can modify the otherwise clear terms of the deed of trust to impose an unwritten duty to execute a partial release.

Further, the Melsons' and First National Bank's reliance on *Eisenhart* is also misplaced. *Eisenhart,* like the two Maryland cases, involved a deed of trust which expressed, in writing, when the lender would be compelled to execute a partial

release of the deed of trust. Because those written conditions were not satisfied before the borrowers' default, no vested right to a partial release could be argued. In contrast, the Traxlers' second deed of trust imposed no duty to execute partial deeds of release whatsoever and thus expressed no written conditions which, if performed prior to default, would create a vested right to a partial release.

In short, the Melsons and First National Bank have cited no legal authority addressing the scenario we face. We are aware of no authority which permits a purchaser who has acquired title to real estate subject to a deed of trust that imposes no obligation on the holder to execute a partial release to nonetheless contend that the holder's conduct has modified the deed of trust to create a vested right in the purchaser to a partial release.

In fact, Missouri law forecloses reliance on the Traxlers' conduct after receipt of the second deed of trust as the source of a "vested right" to a partial deed of release.[12] Some secondary sources suggest that evidence of a party's course of performance, that is to say, the party's conduct after a contract is executed, may be admissible to prove the contract has been modified. *See, e.g.,* Joseph M. Perillo, Calamari and Perillo on Contracts § 3.17 (6th ed.2009).

> Since a course of performance is subsequent to the writing or other record, the aspect of the parol evidence rule that deals with additional terms does not apply to it. Thus, if a course of performance is used to add a term to the writing

**12.** We observe that the Melsons and First National Bank have characterized the Traxlers' relevant conduct as their "course of dealing." This is technically incorrect. "Course of dealing" refers to conduct that occurs *before* a contract is entered into. *See* section 400.1–205(1). In contrast, "course of performance" refers to conduct that occurs *after* a contract is executed. *See* section 400.2–208. While these definitions are found in Missouri's adaptation of the Uniform Commercial Code ("UCC"), they are equally applicable to contracts that do not fall under the UCC.

or other record, the issue is modification or waiver. A course of performance may add a term to the agreement or subtract one.

*Id.* However, our Supreme Court has held that " '[a]cts done by the parties to a contract *after* its making, tending to show an interpretation by them, or by one of them, at variance with the plain terms written in the contract, will not control; but the contract is to be construed as written.' " *Leggett v. Mo. State Life Ins. Co.*, 342 S.W.2d 833, 877 (Mo. banc 1960) (emphasis added) (quoting *Holland Land & Loan Co. v. Holland*, 317 Mo. 951, 298 S.W. 39, 45 (1927)). Though this precedent is more than fifty years old, it has not been overruled or materially modified and is binding upon us.

 Even if *Leggett* did not bind us to the conclusion that the Traxlers' second deed of trust was not modified by their subsequent course of performance to require them to execute partial deeds of release, we would nonetheless reach the same conclusion given the nature of the legal instrument involved in this case. The Traxlers' second deed of trust concerns an interest in land, and falls within the statute of frauds as an instrument which must be in writing to be enforceable. *See* section 432.010 ("[A]ny contract made for the sale of lands, tenements, hereditaments, or an interest in or concerning them . . . shall be in writing and signed by the party to be charged herewith. . . ."). Under Missouri law, any modification to a contract that falls within the statute of frauds must also be in writing to be enforceable. *See, e.g., St. Louis Union Station Holdings, Inc. v. Discovery Channel Store, Inc.*, 301 S.W.3d 549, 552 (Mo.App.

E.D.2009) ("[U]nder the statute of frauds any agreement to modify the terms of [a contract subject to the statute of frauds] must be in writing.").

Here, the Traxlers' execution of partial deeds of release upon contemporaneous request did not constitute a written modification of the second deed of trust. Though the partial deeds of release were in writing and were signed by the Traxlers, none included language obligating the Traxlers to execute partial deeds of release in the future.

 The only "writing" that in any manner addressed the Traxlers' future "obligation" to execute partial deeds of release was the March 2004 letter sent by Knight, in his capacity as the Traxlers' attorney, to Boone Title. Obviously, this letter was not signed by the Traxlers, calling into question its eligibility to satisfy the requirements of the statute of frauds. In any event, the letter made it clear that the Traxlers intended to look at all requests for partial releases on a lot-by-lot basis, hardly an unequivocal undertaking or promise to execute partial releases as to lots in Phase I whenever requested to do so.

The Melsons and First National Bank argue that even though the March 2004 letter said the Melsons intended to look at release requests on a lot by lot basis, the letter also stated (or implied) that partial release requests would be honored if the Samuels were not in default on the promissory note at the time a lot was sold. Whether we agree that this construction of the March 2004 letter is uncontroverted is immaterial.[13] The March 2004 letter from the Traxlers' attorney to Boone Title post-

13. On this subject, the March 2004 letter says only that "[m]y clients want to be of assistance in this way to Mr. and Mrs. Samuel and that is, in large part, because they have been very prompt and regular in making each of the required monthly installment payments on their loan."

dated the Melsons' lot purchase in May 2003. Thus, even if the letter could be construed as an enforceable written modification of the Traxlers' second deed of trust (which we seriously question), the Melsons and First National Bank acquired their interests in the Melsons' lot *before* the argued modification would have taken effect. Second, even if construed as a written modification of the second deed of trust, the letter clearly states that the Traxlers' decision to execute a partial release would be made "when a request is made for the same." When the request was made of the Traxlers to release the second deed of trust on the Melsons' lot, the Samuels were in default on their promissory note. There is no contention the Traxlers have ever agreed, in writing or otherwise, to partially release their second deed of trust on any lot in Phase I if requested to do so after the Samuels were in default.

Finally, the Melsons and First National Bank argue that all of the agreements involving the Traxlers, the Samuels, and/or Boone Bank must be looked at as an integrated "development plan," and that we cannot look at the Traxlers' second deed of trust in isolation. However, the Melsons and First National Bank concede that the Traxlers were not parties to any of the agreements between the Samuels and Boone Bank, that there is no written agreement of any kind between the Traxlers and Boone Bank, and that the docu-

ments between the Samuels and Boone Bank contain no language addressing the partial release of the Traxlers' second deed of trust upon the sale of lots in Phase 1. Thus, even if we were persuaded to read the Traxlers' second deed of trust along with the agreements between Boone Bank and the Samuels as an integrated "development plan" (which we are not), the fact remains there is no written obligation in any of the agreements requiring the Traxlers to partially release their deed of trust.

At oral argument, the Melsons and First National Bank contended that because all of the written agreements involving the Samuels, the Traxlers, and Boone Bank are silent on the subject of the Traxlers' obligation to partially release their second deed of trust upon the sale of lots in Phase 1, we should supply this "omitted" term by looking at the Traxlers' course of performance after receiving the second deed of trust. Though framed slightly differently, this argument is merely a recast of the "vested right to a partial release" argument and faces the same insurmountable hurdle. Under Missouri law, course of performance does not modify a clear and unambiguous writing, and certainly not where a modification must be in writing because the underlying document is subject to the statute of frauds. *See Leggett*, 342 S.W.2d at 877; *St. Louis Union Station Holdings, Inc.*, 301 S.W.3d at 552.[14]

14. The Melsons and First National Bank have not contended in their petition, nor in their motion for summary judgment, that the second deed of trust mistakenly failed to reflect the actual agreement of the Samuels and the Traxlers by failing to address the subject of partial releases due either to a scrivener's error or to mutual mistake, and that the second deed of trust should thus be reformed. Nor have the Melsons and First National Bank contended that the second deed of trust is ambiguous, requiring us to consider extrinsic evidence (including the Traxlers' course of performance) to determine the meaning of the second deed of trust. Finally, the Melsons and First National Bank have not contested the legal validity of the Traxlers' unambiguous second deed of trust, so *Robson v. Diem*, 317 S.W.3d 706 (Mo.App. W.D.2010), is inapplicable. There, we held that although the parole evidence rule prohibits parties and those holding title in privity from a party from relying on extrinsic evidence to alter an unambiguous document, that rule does not apply to third parties challenging "the validity

We conclude, therefore, that the uncontroverted facts asserted by the Melsons and First National Bank in their motion for summary judgment do not establish that they have a vested right to the release of the Traxlers' second deed of trust as a matter of law. Accordingly, the trial court erred in entering summary judgment in favor of the Melsons and First National Bank. We are mindful that this places the Melsons and First National Bank at risk of the loss of their respective investments in the Melsons' lot should the Traxlers proceed with foreclosure. However, the Melsons and First National Bank are not innocent victims without recourse. They acquired their respective interests in the Melsons' lot with actual and constructive knowledge of the Traxlers' second deed of trust and of the fact that the second deed of trust imposed no obligation on the Traxlers to execute a partial deed of release regardless when asked. Though common sense suggests that the Samuels and Boone Bank should have insisted on a written agreement with the Traxlers requiring the Traxlers to partially release their deed of trust upon the sale of lots in order to further the development of Phase 1, neither common sense, nor the Traxlers subsequent gratuitous provision of partial deeds of release on occasion when asked, translate into a legal duty to provide partial deeds of release whenever requested.

As the Melsons' and First National Bank's brief readily acknowledges, Boone Title "failed to secure a release of the [Melsons' lot] from the [Traxlers' second deed of trust]" before closing and insuring title to the Melsons' lot. Boone Title's legal obligation, if any, to take such action as is necessary to either clear the title to the Melsons' lot or to compensate the Melsons and First National Bank for any damages they sustain should the Traxlers foreclose the Melsons' lot, is a subject which is beyond the scope of this opinion.

## Conclusion

We reverse the trial court's judgment granting summary judgment in favor of the Melsons and First National Bank. This matter is remanded to the trial court for further proceedings consistent with this opinion.

All concur.

of a seemingly unambiguous instrument." *Id.* at 713–14.