**R. Douglas STIFF and Laura W. Stiff, Plaintiffs–Respondents,**

**v.**

**Robert H. STIFF, Jr., and B.T. Bones Branson Steakhouse, Inc., Defendants–Appellants.**

**No. 22176.**

Missouri Court of Appeals, Southern District, Division Two.

March 24, 1999.

Motion for Rehearing or Transfer Denied April 8, 1999.

Application to Transfer Denied June 1, 1999.

---

4. Our resolution of Appellant's Point I renders his second point moot. Consequently, we need not and do not address it.

Randall J. Reichard, Lowther, Johnson, Joyner, Lowther, Cully & Housley, Springfield, for appellants.

William Stoner, Springfield, for respondents.

KENNETH W. SHRUM, Presiding Judge.

Plaintiffs sued Robert H. Stiff, Jr. ("Bob") requesting that the trial court order Bob to specifically perform a buy-out provision in a shareholders' agreement.[1] The shareholders' agreement related to the corporate stock of B.T. Bones Steakhouse, Inc. ("the Corporation"). Bob and the Corporation (collectively called "Defendants" herein) counterclaimed, alleging that Plaintiffs breached a duty of loyalty to the Corporation. The trial court entered judgment for Plaintiffs on both claims. Defendants appeal. We reverse and remand in part; we affirm in part.

## PROCEDURAL HISTORY AND BACKGROUND FACTS

This is a dispute between family members who hold most of the shares of the Corporation. The Corporation was organized in 1991 to operate a restaurant in the Branson area. Shortly after its incorporation, Bob solicited family members, including Plaintiffs, for money to help finance the proposed business. Ultimately, Plaintiffs invested $150,000 in the

---

1. In this opinion, when referring to plaintiffs individually, we call them "Doug" and "Laura W." Collectively, we call them "Plaintiffs." We intend no disrespect by these designations. Also we intend no disrespect by referring to Robert Stiff, Jr., as "Bob."

Corporation for which they received forty percent of its outstanding shares. The other original shareholders and their percentages of ownership were: Bob, forty percent; Mr. and Mrs. Larry Snyder, five percent; Mr. and Mrs. Harold Pate, five percent; and Mr. and Mrs. Robert Stiff, Sr., ten percent.

On June 4, 1992, the shareholders agreed to the following:

"8. *PURCHASE PRICE:* It is contemplated by the parties ... that they will from time to time agree upon a valuation for said shares of stock and the last written valuation agreed upon by the parties and on file at the company's office shall be the price to be paid for said shares of stock. Such valuation shall be final and conclusive upon all of the parties. In the event a valuation has not been made within one (1) year prior to the time a Shareholder offers stock for sale ..., there shall be a valuation made of the stock by an independent appraiser unless the parties agree upon a valuation of the shares of stock and such valuations shall be used and binding upon all parties.

. . . .

"20. *MISCELLANEOUS PROVISIONS*

. . . .

"D) At any time after the salary of Robert H. Stiff is increased to $1,000.00 per week, he will purchase, if requested in writing to do so, all of the shares of stock of any Shareholder desiring to sell his or her shares of stock. The price to be paid therefor shall be the amount as set forth in paragraph 8 above."

By July 1994, the triggering event mentioned in paragraph 20 D) had occurred, i.e., the Corporation was paying Bob a salary of $1,000 per week. On July 14, Plaintiffs wrote Bob requesting that he purchase their forty percent stock interest in the Corporation for $556,000. When Bob failed to respond, Plaintiffs sued the Corporation, seeking a judicial dissolution of that entity. Later, Plaintiffs filed a multiple-count amended petition against Defendants. In

Count II, Plaintiffs asked the trial court to order Bob to specifically perform under the shareholder agreement by paying Plaintiffs $556,000 for Plaintiffs' interest in the Corporation.[2] Defendants responded with a counterclaim that charged Plaintiffs had breached their duty of loyalty to the Corporation and sought damages therefor. Ultimately, the case went to trial on a second amended petition for specific performance and on Defendants' counterclaim.

The court heard the case on April 28, 1997, and took it under advisement. On May 16, 1997, the court made the following docket entry:

"The [court] finds that under para 20(d) of the shareholder's agreement [Bob] is obligated to purchase the shares ... of [Plaintiffs]; that the purchase price is to be determined as set forth in paragraph 8 of said agreement; that the parties have never agreed, in writing, as to the value of said shares of stock; that para. 8 provides that an independent appraiser shall value said stock in the event that the parties haven't agreed in writing; that this [court] is acting in equity and can fashion remedies for the parties; that the parties cannot agree upon an independent appraiser. . . . ."

The court named three persons as appraisers, ordered them to value the stock as of July 14, 1994, and directed them to complete the appraisals within ninety days. It also ordered all parties to furnish any information requested by the appraisers.

As of December 23, 1997, the court-appointed appraisers had not completed their work. Several factors contributed to their failure to perform, including Bob's alleged refusal to furnish information about the corporation. Thereon, the trial judge made the following docket entry:

"The [court] finds that the appraisers appted by this [court] in its entries of 5–16–97 and 6–25–97 have been unable to meet and value the stock of the corporation as of 7–14–94 because of the failure or

**2.** By the time of trial, Plaintiffs had dismissed all of their counts except the one requesting specific

performance.

refusal of [Bob] to furnish them with information necessary to form their opinions.

"On 4–28–97 this court heard evid. which would allow this court to set the value of the corporation's stock as of 7–14–94. The [court] determines that the value of [Plaintiffs'] stock, as of 7–14–[94] was $556,000.; the [court] sustained [Plaintiffs'] petition; the court enters a judgmt. of specific performance as prayed therein."

In this same docket entry, the judge assessed costs and allocated responsibility for the appraisers' fees and then directed Plaintiffs' lawyer to submit a "formal" judgment for his signature. A later docket entry ruled Defendants' counterclaims adversely to them.

The judgment did not include or incorporate all of the trial judge's findings as entered on the docket sheet. Leaving out the caption, opening paragraph, cost and expense assessments, and judge's signature, the judgment reads:

"The Court hereby values the Plaintiffs' shares of stock at $556,000.00 and grants Plaintiffs' request for specific performance. Defendant Robert H. Stiff, Jr. is ordered to pay $556,000.00 to ... Plaintiffs ... for Plaintiffs' stock in [the Corporation] and Plaintiffs are thereafter ordered to transfer all of their shares in the corporation to Defendant Robert H. Stiff, Jr.

"On Defendants' Counterclaim against the Plaintiff[s], the Court finds in favor of the Plaintiff[s] and against the Defendants."

This appeal followed.

## DISCUSSION AND DECISION

*Insufficient Evidence to Support Specific Performance*

■ In his first point, Bob argues that the trial court erred in ordering specific performance of the buy-out provision because there was no evidence in this record of a "written valuation agreed upon by the shareholders" as described in the contract, no evidence of stock value established by independent appraisal as contemplated by the contract, and no evidence from any source "about the precise value of the stock" as of July 14, 1994.

Plaintiffs filed a brief with this court but it does not respond to Bob's first claim of trial court error. In oral argument, however, Plaintiffs conceded the correctness of part of Bob's first point, i.e., there is no evidence in this record of a "written valuation agreed upon by the shareholders" as contemplated by the shareholder agreement.

As best we can glean from Plaintiffs' comments during oral argument, they appear to say that certain testimony by Doug, along with an excerpt from a shareholder meeting held March 24, 1994, supports the $556,000 figure used by the trial court when it ordered specific performance. We disagree. Neither the minutes nor Doug's testimony provides substantive evidence regarding the source of the $556,000 figure.

Doug testified that in January 1994 he learned from Bob that a firm called "Roberts and Associates" of Springfield, Missouri, had appraised the Corporation at Bob's request. However, that appraisal was never admitted into evidence because the trial court sustained Bob's objection thereto.

The Roberts and Associates' appraisal was discussed at a March 24, 1994, shareholder meeting, and the minutes of that meeting are in evidence. We reproduce that part of the minutes concerning the appraisal.

"VII. Appraisal of B.T. Bones cost $1800. Doug asked why appraisal was done despite the decision by the Directors that no appraisal would be done. Bob replied an appraisal was decided since stock was talked about being sold. The land, building and equipment were appraised at $1.59 million. The business value was said to be $300,000 to $500,000 with total value to be between $2.1 million to $2.25 million. The current debt is $879,000 due to an accounts payable of approximately $164,000, a $60,000 loan not approved by Board of Directors...."

The following is Doug's only testimony concerning the $556,000.00 figure.

"Q. [to Plaintiff Douglas Stiff] In your July 14, 1994, letter requesting that [Bob] purchase your stock, what value did you assess to B T. Bones?

"A. We assessed the value—

"MR. LOWTHER: [Bob's attorney]— Same objection—

"A. —at $2,090,000.00

"Q. Was that value more or less than the value discussed at that March, 1994, meeting?

"A. That was actually less than the $2.1 to 2.25 million that the group had agreed upon.[3]

"Q. How did you arrive at that value?

"A. We took the appraised value for the land, buildings, furnishing and equipment, which was 1 million—

"MR. LOWTHER:—Objection as to how he valued anything because that is not in writing, whatever evaluation he came up with, and how he came up with it is irrelevant."

The attorneys and the judge then had a lengthy colloquy, which ultimately ended in this fashion:

"THE COURT: Is this question some sort of a foundation question dealing with these minutes of March of '94? I mean, what's the relevance?

"MR. EVANS: [Attorney for Plaintiffs] Yeah, I guess ... it's not ... necessarily relevant to this. It simply was additional background as to how we came to this number, and we've already testified that the number was agreed upon, so I would agree. I don't know that there is any direct relevance.

"THE COURT: Okay. Ask another question."

In answer to further questions, Doug testified that he asked Bob to pay Plaintiffs $556,000 for their stock. Next, Doug's lawyer asked how he arrived at the $556,000

figure. Bob's attorney objected to this question, arguing that any response would be hearsay. The objection prompted the following colloquy and testimony:

"THE COURT:—Wait a minute. If the price is something other than the agreed upon valuation that's in writing, and on file pursuant to paragraph 8 of the buy/sell agreement or based upon this independent appraisal procedure, then it's irrelevant.

. . . .

"MR. LOWTHER: [Bob's attorney] My objection is that his value is based on hearsay, and if you look at the cases there, it's based solely on the appraisal. He's admitted it's based solely on the appraisal. Using that as independent substantive evidence that's inadmissible under the case law, Your Honor, and I object to any testimony because that is how he arrived at it.

"THE COURT: Well, if it's 40 percent of some figure that was in writing and on file with the corporation pursuant to paragraph 8, he can say 'I used that figure and multiply it times 40.'

"MR. LOWTHER: My objection ... is that there was nothing in writing, agreed upon by the parties.

"THE COURT: Go ahead. Ask a question.

"Q. (by Mr. Pearman): [Plaintiffs' attorney] What did you multiply your 40 percent times to get the price that you requested he buy you out at?

"A. We multiplied 40 percent times $1,390,000.00 to achieve—to arrive at a figure of $556,000.00."

While the foregoing reveals how Plaintiffs arrived at the $556,000 figure, it does not

---

**3.** At trial, Plaintiffs took the position that "with [Roberts and Associates'] appraisal in place," the discussion of that appraisal at the March 24, 1994, shareholder meeting and the minutes thereof amounted to a "written valuation agreed upon by the [shareholders]," as provided in paragraph 8 of the shareholders' agreement. Apparently, it was that alleged agreement to which Doug was referring in this answer. As noted earlier, Plaintiffs have abandoned that position on appeal, as well they should. The excerpt from the minutes starts on a discordant note by referring to Doug's claim that the procurement of the appraisal was contrary to the board's

directive. Moreover, the introductory paragraph of the minutes reflects that only five of the nine shareholders personally attended this meeting. Consequently, the minutes cannot constitute a "written valuation agreed upon" by all shareholders mentioned in the contract. In fact, the minutes do not even show that the shareholders who were present agreed to the appraised amount. No one moved to adopt or approve the appraisal, there was no vote or other action taken to reflect approval or disapproval, and the minutes contain nothing from which an agreement on value can be implied.

reveal evidence from which the trial court could find or infer that the $1,390,000 figure came from any of the contractual procedures for establishing value, i.e., a "written valuation agreed upon by the parties" or an "independent" appraisal.

■ In Missouri, the remedy of specific performance may be invoked to enforce contracts for the sale of corporate stock. *See Kludt v. Connett,* 350 Mo. 793, 168 S.W.2d 1068[1] (1943). However, as with any action for specific performance, "the right to sue is triggered by the failure of a party to do that which is contracted for, in accordance with the procedure established by the contract." *See Carondelet Health System v. Royal Gardens,* 943 S.W.2d 669, 672[1] (Mo.App.1997). Here, the procedure created by the shareholders' contract for setting the corporate stock's value was by "written valuation agreed upon by the parties and on file in the company's office" or, in its absence, "a valuation made of the stock by an independent appraiser." The trial court found—rightfully so—that "the parties have never agreed, in writing, as to the value of said shares of stock." Thereon, the trial court turned to the other contractual procedure, i.e., finding stock value by using independent appraisers. Unfortunately, the court abandoned that procedure and used a stock value figure derived by some means other than a "procedure established by the contract." Under *Murphy v. Carron,* 536 S.W.2d 30, 32[1] (Mo.banc 1976), the judgment of the trial court will not be disturbed if there is substantial evidence to support its finding. Here, however, we cannot find sufficient evidentiary foundation for the trial court's evaluation of Plaintiffs' stock at $556,000. Bob's first point has merit and is granted.[4]

*Alleged Error in Denying Counterclaim for Breach of Loyalty*

Defendants' third point relied on maintains

"THE TRIAL COURT ERRED IN DENYING [DEFENDANTS'] COUNTERCLAIM AGAINST LAURA W. STIFF FOR DAMAGES BECAUSE LAURA W. STIFF BREACHED HER DUTY OF LOYALTY AND CAUSED DAMAGE TO [DEFENDANTS] IN THAT SHE MALICIOUSLY REPORTED THE CORPORATION TO THE INTERNAL REVENUE SERVICE, MADE IMPROPER COMMUNICATIONS TO THE CORPORATION'S VENDORS, AND MADE UNSUBSTANTIATED CLAIMS TO NUMEROUS LAW ENFORCEMENT OFFICIALS ALL TO THE HARM AND DETRIMENT OF THE CORPORATION."

■ We analyze this point having in mind the general rule that "[t]he party asserting the positive of a proposition bears the burden of proving that proposition." *Dycus v. Cross,* 869 S.W.2d 745, 749[4] (Mo. banc 1994). Thus, a litigant who seeks to collect money bears the burden of establishing his or her case, whether in tort, contract, or something else. *Chandler v. New Moon Homes, Inc.,* 418 S.W.2d 130, 135[4] (Mo. banc 1967). It is equally well established that where a party has the burden of proof on an issue and where the evidence presented thereon is not conclusive, a judgment in favor of the opposing party requires no evidentiary support because the trier of fact may disbelieve the proponent's uncontradicted or uncontroverted evidence. *Bakelite Co. v. Miller,* 372 S.W.2d 867, 871 (Mo.1963). "Generally, the party not having the burden of proof on an issue need not offer any evidence concerning it." *Brown v. Mustion,* 884 S.W.2d 365, 369 (Mo.App.1994). Here, Defendants had the burden of proving their counterclaim against Laura W. and the judgment for Laura W. did not have to be supported by any evidence. *Id.; Feick v. Fenlon,* 939 S.W.2d 537, 538[1] (Mo.App.1997).

---

4. We do not ignore Plaintiffs' argument that the trial court's determination of the value of their stock was made as a sanction for Bob's refusal to furnish the court-appointed appraisers with information necessary to form their opinions. The problem with this argument is that it has no support in the record. We find no indication in the record that the trial court ever ruled on Plaintiffs' second motion for sanctions, much less imposed the sanction now suggested by Plaintiffs. To the contrary, the trial court expressly stated that it was relying on evidence in the record—not a sanction against Bob—in setting the amount to be paid by Bob for Plaintiffs' stock.

The trial court by its judgment reveals that it did not accept (or believe) the evidence presented by Defendants concerning Laura W.'s motives. For all practical purposes, that ends the matter. *See Miller v. Gayman,* 482 S.W.2d 414, 419 (Mo.1972). Nothing in this record compels a judgment for Defendants on their counterclaim as a matter of law, nor is the trial court's ruling against the weight of the evidence. Point III is denied.

We affirm that part of the judgment that ruled Defendants' counterclaim adverse to them. We reverse and remand that part of the judgment that decreed specific performance of the buy-out provision of the shareholders' contract.[5] On remand, the trial court may, in its discretion, (1) allow Plaintiffs to retry the case on the specific performance theory as presently pled and if Plaintiffs show themselves entitled to relief, either order specific performance, or decide if Plaintiffs are entitled to damages instead of specific performance and, if so, how much, *see Collins v. Jenkins,* 821 S.W.2d 892, 894[7] (Mo.App.1992); or (2) allow Plaintiffs to plead and submit another theory. *See Centerre Bank of Kansas City v. Angle,* 976 S.W.2d 608, 615[5] (Mo.App.1998).

GARRISON, C.J., and BARNEY, J., concur.

**5.** Our resolution of Point I renders Bob's second and fourth points moot; consequently, we need not and do not discuss them.