**Theresa GRISHAM, Respondent,**

v.

**The MISSION BANK, Appellant.**

**WD 79964**

Missouri Court of Appeals,
Western District.

OPINION FILED: June 13, 2017

Motion for Rehearing and/or Transfer to Supreme Court Denied
August 1, 2017

Application for Transfer Denied
November 21, 2017

---

James A. Kessinger and Luke A. Demaree, Kansas City, MO, Attorneys for Respondent.

David D. Ferguson, G. Edgar James, and Daniel A. Stuart, Kansas City, MO, Attorneys for Appellant.

Before Division Two: Thomas H. Newton, Presiding Judge, and James Edward Welsh and Karen King Mitchell, Judges

Karen King Mitchell, Judge

The Mission Bank appeals from the trial court's judgment in favor of Theresa Grisham on her claims of wrongful foreclosure, breach of contract, and unjust enrichment, in which she sought damages following Bank's foreclosure sale of Grisham's real property pursuant to a deed of trust. Bank argues that, because Grisham had defaulted under the terms of various loan documents before Bank exercised its right to seek foreclosure, she should not have been allowed to pursue any of her claims. We agree and reverse the judgment below.

## Background

Grisham and her former husband owned and operated their own business, Grisham Grading and Excavating, Inc. (GGE), a Kansas corporation. The Grishams also had a custom-built home on 150 acres in Platte City, Missouri. At its highest value, the home and surrounding real estate was worth approximately $2.1 million.

To facilitate their business, the Grishams executed several promissory notes with Bank, which were secured by various equipment and personal property, personal guaranties from the Grishams, individually, and their real property. The following chart identifies the notes at issue in this appeal, their principal amounts, their interest rates, and their corresponding security:

| Loan Number | Amount[1] | Interest Rate | Collateral |
|---|---|---|---|
| 740040 | $3,000,000 | 6.00% | Equipment, vehicles, personal guaranties from Grisham and her ex-husband, 5th Deed of Trust on Grisham's real property |
| 324054 | $250,000 | 6.00% | Personal guaranties of Grisham and her ex-husband, 3rd Deed of Trust on Grisham's real property |
| 324104 | $250,000 | 6.00% | 4th Deed of Trust on Grisham's real property |
| 324105 | $250,000 | 6.00% | 1st Deed of Trust on Grisham's real property |

1. The loan amounts were lines of credit and do not necessarily represent the actual amount provided by Bank to Grisham.

There are four Deeds of Trust at issue in this appeal that were executed on Grisham's real property in connection with the various notes. Each Deed of Trust provided for future advances and obligations and contained "Mother Hubbard" provisions[2] as well as provisions indicating a "maximum lien" amount. In the 3rd, 4th, and 5th Deeds of Trust, the "future advances" provision stated:

> In addition to the Note, this Deed of Trust secures all future advances made by [Bank] to Borrower or Grantor whether or not the advances are made pursuant to a commitment. Specifically, without limitation, this Deed of Trust secures, in addition to the amounts specified in the Note, all future obligations of Borrower or Grantor to [Bank] and all future amounts [Bank] in its discretion may loan to Borrower or Grantor, together with all interest thereon; however, in no event shall such future advances and obligations (excluding interest) exceed in the aggregate [the maximum lien amount].

The 3rd, 4th, and 5th Deeds of Trust also contained "cross-collateralization" provisions, which provided:

> In addition to the Note, this Deed of Trust secures all obligations, debts and liabilities, plus interest thereon, of either Grantor or Borrower to [Bank], or any one or more of them, as well as all claims by [Bank] against Borrower or Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Borrower or Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable. If [Bank] is required to give notice of the right to cancel under Truth in Lending in connection with any additional loans, extensions of credit and other liabilities or obligations of Grantor to [Bank], then this Deed of Trust shall not secure additional loans or obligations unless and until such notice is given.

The 1st Deed of Trust contained a "secured debt and future advances" provision, which provided:

> The term "Secured Debt" is defined as follows:
>
> A. Debt incurred under the terms of all promissory note(s), contract(s), guaranty(s) or other evidence of debt described below and all their extensions, renewals, modifications or substitutions....
>
> PROMISSORY NOTE #1041000296-501 DATED SEPTEMBER 19, 2001 IN THE AMOUNT OF $250,000[3]
>
> ☒ Line of Credit. The Secured Debt includes a revolving line of credit

---

**2.** A "Mother Hubbard" clause is "[a] clause stating that a mortgage secures all the debts that the mortgagor may at any time owe to the mortgagee.—Also termed *anaconda clause*; *dragnet clause*." MOTHER HUBBARD CLAUSE, Black's Law Dictionary (10th ed. 2014). "The purpose of the dragnet clause is to provide a sort of contingent cross-collateralization; if any other loan is made in the future, the presently mortgaged real estate will serve as additional collateral for it." Grant S. Nelson & Dale A. Whitman, *Rethinking Future Advance Mortgages: A Brief for the Restatement Approach*, 44 Duke L.J. 657, 671-72 (1995).

**3.** This promissory note was initially issued by a lender other than Bank and was later assigned to Bank and given the new loan number of 324105.

provision. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released. ·

...

B. All future advances from Lender to Grantor or other future obligations of Grantor to Lender under any promissory note, contract, guaranty, or other evidence of debt existing now or executed after this Security Instrument whether or not this Security Instrument is specifically referenced. If more than one person signs this Security Instrument, each Grantor agrees that this Security Instrument will secure all future advances and future obligations that are given to or incurred by any one or more Grantor, or any one or more Grantor and others. All future advances and other future obligations are secured by this Security Instrument even though all or part may not yet be advanced. All future advances and other future obligations are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment must be agreed to in a separate writing.

C. All obligations Grantor owes to Lender, which now exist or may later arise, to the extent not prohibited by law, including, but not limited to, liabilities for overdrafts relating to any deposit account

agreement between Grantor and Lender.

D. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

The "maximum lien" provision in the 5th Deed of Trust provided: "The total principal amount of obligations at any one time which is secured by this Deed of Trust, in addition to any interest and any amounts advanced by [Bank] for the protection of the security interests granted herein, is $500,000." The same language was used in the 3rd and 4th Deeds of Trust, with the only difference that the amount identified was $250,000, rather than $500,000. Unlike the 3rd, 4th, and 5th Deeds of Trust's "maximum lien" provision, the 1st Deed of Trust contained a "maximum obligation limit" provision. That provision provided:

The total principal amount secured by this Security Instrument at any one time shall not exceed $250,000. This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

The following chart identifies the various Deeds of Trust, the loans secured by each, and their "maximum lien" amounts:

| Deed of Trust | Loan Number | Maximum Lien/Obligation Limit |
|---|---|---|
| 1st Deed of Trust | 324105 | $250,000 |
| 3rd Deed of Trust[4] | 324054 | $250,000 |
| 4th Deed of Trust | 324104 | $250,000 |
| 5th Deed of Trust | 740040 | $500,000 |

The Grishams divorced in 2007, and upon their dissolution, Theresa Grisham was awarded the marital home and real property. By March of 2009, Loans 324105, 324054, 324104, and 740040, along with other loans, had matured and not been paid. Additionally, GGE's bank account was then overdrawn by $27,000. Accordingly, because of GGE's apparently dire financial condition and Grisham's failure to make payments, Bank determined that its ability to collect approximately $2.55 million in outstanding indebtedness was materially impaired, resulting in a default under the various loan documents.

Grisham requested that Bank forbear from exercising its rights and remedies under the loan documents, and Bank agreed, so the parties entered into a Forbearance Agreement on April 6, 2009.[5] As part of that agreement, Grisham acknowledged her default on the various loan documents and agreed that the amount of the outstanding indebtedness was approximately $2.55 million. Grisham agreed to make regularly scheduled interest-only payments in the amount of $13,215.11 (plus accrued interest on a new note executed simultaneously with the Forbearance Agreement) to Bank on the 15th day of each month, beginning on May 15, 2009.

On August 31, 2009, the parties entered into a First Amendment to Forbearance Agreement, wherein Grisham again acknowledged the prior default and acknowledged that the outstanding indebtedness was then approximately $2.75 million. The First Amendment required Grisham to make regularly scheduled interest payments at a rate of 6.00% on the 15th day of

each month on all debt obligations beginning September 15, 2009, along with regularly scheduled principal payments of $8,000 on loan number 740040 on the 15th of each month, beginning on March 15, 2010. The First Amendment further provided: "Notwithstanding any provision of this Agreement or any Loan Document to the contrary, [Bank] may in its sole discretion apply any funds it receives (including by setoff or otherwise) in connection with the Obligations in any manner it sees fit and for any purpose." The parties agreed that, in the absence of any other termination events, the Forbearance Agreement would expire on July 15, 2010, at 5:00 p.m.

The Forbearance Agreement was amended a second time in February of 2010, providing for an additional advance and adding, as a repayment obligation, that Grisham was to repay all obligations in "the amount of all proceeds received in connection with work related to [the EPA contract]."

July 15, 2010, came and went, and the Forbearance Agreement expired by its own terms. In either late summer or early fall of 2012, Grisham advised Bank that she intended to sell her home. Grisham worked to get the house ready for sale and eventually put it on the market. Before it was officially on the market, however, Grisham offered it to an individual in December 2012 for $2.4 million. The potential buyer counteroffered $1.8 million. Grisham then came back with a figure of $2.1 million, but the potential buyer decided not to buy the home. During this time, GGE was still conducting work on its contract with the EPA until approximately January of 2013. The final EPA payment on the con-

4. A separate lender, Bank of America, held the Second Deed of Trust. Unlike the other four Deeds of Trust, the Second Deed of Trust did not contain any provisions related to future advances or obligations.

5. It appears that Bank was willing to enter the Forbearance Agreement because of the existence of a contract GGE had with the Environmental Protection Agency, beginning on June 4, 2009.

tract came in around January or February of 2013. Grisham did not receive any other offers on her home until mid-May 2013.

Beginning May 5, 2013, Grisham started requesting a "payoff" letter against the liens on her property in order to determine what amount was needed to release the deeds of trust. Bank advised Grisham that the various deeds of trust secured $1.25 million, even though the principal amount remaining on at least one of the loans secured by a deed of trust carried a zero balance.

On May 9, 2013, Bank sent three letters to Grisham, notifying her that all promissory notes had matured and all forbearance agreements had expired by their own terms. The letters further identified the outstanding balances on each loan as of April 18, 2013, and advised Grisham that the amounts were then due and payable. The letters further advised that, if Grisham failed to make payment within ten days, Bank would take action to enforce the terms of its security agreements, potentially including a non-judicial foreclosure sale of Grisham's home and surrounding land.

Grisham received a second offer on the property on May 15, 2013, in the amount of $1.725 million. Grisham again sought a "payoff" letter from Bank to discern how much money would be required to release the deeds of trust, and she eventually enlisted the help of legal counsel to obtain a "payoff" letter. Grisham's attorney and Bank's legal counsel then exchanged a series of letters regarding Grisham's requested "payoff" letter. In seeking a "payoff" letter, Grisham was seeking "an assurance from the bank that upon payment, they w[ould] release their deed of trust." Because she was unable to secure a "payoff" letter as she envisioned, Grisham ultimately rejected the offer.

On May 22, 2013, Bank sent Grisham's attorney a letter indicating that Grisham's loans were all cross-collateralized, that the various deeds of trust were future advance deeds of trust, and that they secured repayment of outstanding indebtedness up to $1.25 million. Bank advised that "the sums owed by your clients as of May 31, 2013 for principal and interest total Three Million Seventy-eight Thousand Nine Hundred Ninety-two and 86/100 Dollars ($3,078,992.86)." Bank then broke that number down by each loan, stating both the principal balance and accrued interest, along with the per diem rate. Bank noted that all promissory notes had matured and all forbearance agreements had expired, making all sums due and payable. Bank further noted that it was "most likely undersecured," and had been "provided with no plan of repayment"; thus, it "ha[d] no other option but to proceed with the remedies allowed it under the Loan Documents."

Two weeks later, Bank went to the property to inspect its equipment collateral but found several items missing and unaccounted for. On June 12, 2013, Bank sent Grisham notice of a trustee's sale under the 5th Deed of Trust of her home and land. The sale was scheduled for July 12, 2013, at 2:00 p.m.

On June 23, 2013, Bank conducted a replevin of Bank's equipment collateral from Grisham's property. On June 24, 2013, Grisham's attorney sent a letter to Bank asking Bank to "respond by sending your letter telling me what it will take to stop the foreclosure of the farm on July 12, 2013." Bank responded, noting that several items of equipment were discovered to be missing the prior day during the replevin and further noting that, "[w]ith respect to the non-judicial foreclosure sale of the real estate that secures the obligations, as referenced on the face of the deed of trust being foreclosed, the principal amount of the obligations secured is $500,000.00." On

June 25, 2013, Grisham's attorney sent Bank another letter, stating:

Based upon the last paragraph of your letter, in which you state:

"With respect to the non-judicial foreclosure sale of the real estate that secures the obligations, as referenced on the face of the deed of trust being foreclosed, the principal amount of the obligations secured is $500,000.00;"

Tender is hereby made for payment of $500,000.00 to be made by wire transfer of U.S. Dollars on July 3, 2013 in exchange for release of the Deed of Trust and cancellation of the sale.

Please confirm by close of business on June 26, 2013, that you will accept the tender of the amount stated in your letter and upon receipt of the wire, will return a release for the Deed of Trust, and cancel the current foreclosure sale.

Grisham planned to use either proceeds from a private sale of the property or loans from friends to pay the proposed "tender." But she never actually submitted any payment to Bank on the proposed tender.

On June 26, 2013, Grisham attempted to enter a sale contract with a family friend who agreed to pay $1.35 million for the property, but the sale did not go through because the title company could not guarantee clear title in light of the deeds of trust remaining on Grisham's property.

Bank held the foreclosure sale as scheduled, and Bank purchased the property for $673,155.28—an amount representing the maximum lien amount of the 5th Deed of Trust along with accrued interest. Bank listed the property for sale in October 2013, with an asking price of $1.695 million. Bank later entered a sale contract for $1.35 million.

Grisham filed suit against Bank, seeking damages for an alleged breach of contract under the various deeds of trust, unjust enrichment, and wrongful foreclosure.[6] Grisham argued that Bank breached its contract and engaged in wrongful behavior by both failing to provide a "payoff" letter and refusing her proposed $500,000 tender. She further argued that Bank was unjustly enriched by capturing the equity in her home to which it was not entitled, as its lien was limited to the $500,000 maximum lien stated on the face of the 5th Deed of Trust. The trial court agreed, finding that "Bank had a duty to [Grisham] to provide a payoff letter," that Bank "refused to provide a payoff letter to [Grisham] in order to prevent [Grisham] from selling her farm and home," and that "Bank's conduct was wrongful." The court further found that "Bank demanded more than the sums secured by the Deeds of Trust, and that ... Bank's demands were improper and constituted a wrongful act" that "prevented [Grisham] from making a tender of the amount secured by the Deeds of Trust." The court awarded Grisham $725,000 in economic damages, $25,000 for emotional distress, and $100,000 in punitive damages. The court also assessed $18,300 in fees for an appointed Master, as well as costs of the action, against Bank. Bank appeals.

## Standard of Review

▅▅▅ ■ "We review this court-tried case under the standard articulated in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)." *Brasher v. Craig*, 483 S.W.3d 446, 450 (Mo. App. W.D. 2016). "We will affirm the judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Id.* "We re-

---

6. Grisham brought a total of twelve counts against Bank, but she dismissed several and the court entered judgment in her favor on only the three identified.

view the evidence in a light most favorable to the judgment, accept it as true, and disregard any contradictory evidence." *Id.* (quoting *Lowe v. Hill*, 430 S.W.3d 346, 348-49 (Mo. App. W.D. 2014)). "We also defer to the circuit court's determination of the weight to be given the evidence and credibility of the witnesses." *Id.* "The circuit court is free to believe some, all, or none of the testimony of any witness." *Id.*

## Analysis

Bank raises ten points on appeal. First, Bank argues that the court erred in granting judgment to Grisham on her wrongful foreclosure action because it erroneously applied the law insofar as Missouri law does not allow damages for wrongful foreclosure where the debt was in default before the foreclosure commenced. Second, Bank argues that the court erred in granting judgment to Grisham on any of her claims because it erroneously declared the law in determining that Bank's foreclosure was improper due to the absence of a "payoff" letter. Third, Bank argues that the court erred in granting judgment to Grisham on any of her claims because it misapplied the law in determining that Bank wrongfully prevented Grisham from making a tender. Fourth, Bank argues that the court erred in granting judgment to Grisham on any of her claims because the court erroneously construed the contracts as permitting Grisham to discharge all of her debt by paying only the secured portion thereof. Fifth, Bank argues that the court erred in granting judgment to Grisham on her breach of contract claim because it erroneously applied the law by allowing Grisham to recover damages against Bank where she was the first party to breach the contract. In Bank's ninth point on appeal, Bank argues that the court erred in granting judgment to Grisham on her unjust enrichment claim because it misapplied the law by recognizing the claim insofar as Missouri law does not

permit claims based upon an implied contract where an express contract exists and governs the dispute. Finally, Bank's sixth, seventh, eighth, and tenth points on appeal all relate to the court's award of various damages and the amounts thereof. But because we resolve Bank's claims on its Points I, V, and IX, we do not reach Points II-IV, VI-VIII or X.

### A. Future advance deeds of trust differ in operation from ordinary deeds of trust.

Both Grisham's arguments and the trial court's judgment evidence a fundamental misunderstanding below regarding the operation of future advance deeds of trust. Thus, a brief discussion of how such deeds of trust operate is in order.

In 1981, § 443.055, governing secured transactions involving future advances, was enacted. Rita Carper Sowards, *Future Advances in Missouri*, 49 Mo. L. Rev. 103, 103 (1984). Though "Missouri traditionally ha[d] accepted the validity of mortgages to secure future advances," the new statute "offered a workable and definitive technique for resolving priority disputes between a mortgagee making such advances and an intervening lienor." *Id.* Section 443.055 "ma[d]e[ ] it clear that a mortgage to secure future advances is valid and enforceable for a ten-year period," and "[b]y complying with the statute, a mortgagee can [en]sure priority for those advances as of the date the mortgage is recorded." *Id.* In other words, by including a future advance or future obligation provision, a lender can ensure that its security instrument retains its priority, even in the face of intervening liens between the instrument's execution date and any future advances given or future obligations incurred.

Under § 443.055.2, "[s]ecurity instruments [such as deeds of trust] may secure

future advances or other future obligations of a borrower to a lender, whether the advances or obligations are optional or obligatory with the lender." [7] And, "[t]he future advances or future obligations may be evidenced by one or more notes, guarantees or other documents evidencing indebtedness of a borrower to lender, which documents shall not be required to be executed or delivered prior to the date of the security instrument securing them." *Id.*

Here, Bank's 5th Deed of Trust secured both future advances and future obligations and was expressly governed by § 443.055. According to the statute, a "future advance" is

> any advance of funds, disbursement of loan proceeds or other exchange of value or consideration from a lender to, or on behalf of, a borrower that occurs after the date of the security instrument securing such future advance, regardless of whether such advance is made under a note, contract, guarantee or other evidence of indebtedness that was executed prior to or contemporaneously with such

security instrument or made under a future obligation.

§ 443.055.1(5). And a "future obligation" is an obligation or debt of a borrower to a lender arising under a note, contract, guarantee or other evidence of indebtedness that was executed or otherwise became effective after the date of the instrument securing such future obligation, including, without limitation, any note or agreement that renews, extends, or otherwise modifies an obligation of a borrower to a lender that is secured by a security instrument under this section. *Id.* at § (6).

Every security instrument covering future advances or obligations must "clearly state[ that fact] within the body of the security instrument ..., and the security instrument shall state the face amount." § 443.055.2. "The total amount of obligations that may be secured by such a security instrument may decrease or increase from time to time, but except as to advances made [for reasonable protection of the lender's security interest [8]], the total *principal* amount of the obligations secured at any given time may not exceed

---

**7.** Under the common law, future advance clauses proved problematic insofar as the existence of such a clause could preclude a borrower from using available equity in his or her collateral to secure a second loan, as the second lienholder risked the chance that future advances given from the first lienholder would consume all of the equity upon which any secondary lien could be based, thereby depriving a second lienholder of any security and leaving a would-be borrower without any willing lenders. Nelson & Whitman, *supra* note 2, at 666. To combat this problem, courts adopted "the optional/obligatory advance doctrine," which held "that if a mortgagee is contractually obligated to make advances, they will be senior to any intervening lien," but "if future advances are optional with the mortgagee (that is, the mortgagor has no contractual right to demand advances), and if the mortgagee has notice of an intervening lien at the time advances are made, they lose priority

to the intervening lien." *Id.* at 668-69. But because "judging whether advances will be optional or obligatory can involve subtle issues of both fact and law[,] ... the optional/obligatory distinction rarely accomplishes its purpose [of] ensur[ing] that a borrower with substantial equity can obtain additional financing." *Id.* at 670. Accordingly, § 443.055 abolished this distinction.

**8.** § 443.055.3(1). These advances or obligations "may include, but shall not be limited to ... amounts due under prior mortgages or deeds of trust, ... or other encumbrances, and reasonable costs and attorneys' fees incurred in enforcing the security instrument or the indebtedness which it secures." *Id.* The exception also covers future advances and obligations incurred under a construction loan, but that exception is not applicable here. *Id.* at § (2).

the face amount stated in the security instrument." *Id.* (emphasis added). As for those future advances or obligations secured for the reasonable protection of the lender's security interest, those advances or obligations are also secured by the security instrument "*even though such future advances or ... obligations cause the total indebtedness to exceed the face amount stated in the security instrument.*" § 443.055.3(1) (emphasis added). In other words, the maximum lien provision in a future advance deed of trust serves to identify only the total amount of *principal* secured at any given time by the deed of trust, but it does not represent either the total amount of *secured* indebtedness or the total amount of overall indebtedness.[9]

■ Unlike ordinary security instruments, the existence of those containing future advance or future obligation provisions in compliance with § 443.055 are not "adversely affected if at any time on or after the date of such security instrument there are no obligations then secured by the security instrument or the obligations secured by the security instrument are reduced to zero." § 443.055.2. In other words, the mere existence of a zero balance on a loan secured by a future advance deed of trust does not mandate the release of the collateral covered by the future advance deed of trust. The reason a zero balance has no effect is because of the remaining availability of potential future advances or obligations secured by the same collateral. To eliminate the effect of a future advance or future obligation provision, a borrower need only provide notice

to the lender, stating "that the party sending the notice is the present owner of the interest in the real property encumbered by the security instrument and that the prior owner elects to terminate the operation of the instrument as security for future advances or future obligations made or incurred after the date the lender receives the notice." § 443.055.6. Then,

> [w]ithin fifteen days of the receipt of such a notice, the lender shall at its own cost record where the original security instrument was recorded, a statement referring to the original security instrument, legally describing the real property therein, setting forth the fact of the receipt of the notice, stating the date of the receipt of such notice, and stating the total principal amount as of the date it received the notice of all the then outstanding debts and obligations secured by the security instrument.

*Id.* "Should the lender fail to file the statement ... within the time period specified, the[n] the[ ] owner may file a similar statement, and the lender shall be irrevocably bound by that party's statement of the total principal amount of the outstanding debts and obligations secured by the security instrument, so long as the statement is made in good faith." *Id.* at § (3).

Only *after* a future advance or future obligation provision is cancelled through the statutory notice procedure will a zero balance on the underlying obligation mandate release of the security instrument. *See* § 443.060.1 ("If any mortgagee ... receive full satisfaction of any security in-

---

9. "Advances exceeding the amount stated in the agreement [other than those specified in § 443.055.3] are unsecured." Rita Carper Sowards, *Future Advances in Missouri*, 49 Mo. L. Rev. 103, 114 n.80 (1984). But

> [a]dvances in excess of the face amount of the mortgage should be unsecured only to the extent of the surplus. Section 443.055.2 provides that "the total amount ... may

decrease or increase." This indicates that surplus advances should become secured as the mortgage is paid down, with priority dating back to the date of the mortgage. The "total amount" refers to the balance at any given time, rather than to an absolute maximum determined as of the date of the mortgage.

*Id.* at 115 n.83.

strument, he shall, at the request and cost of the person making the same, deliver to such person a sufficient deed of release of the security instrument.").

Here, the 5th Deed of Trust secured not only $500,000 in principal on loan number 740040 at any given time, per its maximum lien provision, but also the corresponding interest on that $500,000 and any other existing or future obligation or advance under its cross-collateralization provision.[10] At the time Grisham and Bank executed the 5th Deed of Trust, Grisham had existing obligations through the 1st, 3rd, and 4th Deeds of Trust, as well as through other loans and her personal guaranty of all indebtedness to Bank. And following execution of the 5th Deed of Trust, Grisham incurred further obligations to Bank through the Forbearance Agreement and its subsequent amendments. And at no time has Grisham ever provided Bank with the notice contemplated under § 443.055.6 in order to cancel the effect of the future advance and future obligation provision within the 5th Deed of Trust. With that background in mind, we now turn to Bank's points on appeal.

**B. Grisham was not entitled to relief on her claim for damages from wrongful foreclosure because she failed to prove that Bank lacked a right to foreclose (Bank's Point I).**

In its first point on appeal, Bank argues that the trial court misapplied the law in granting judgment to Grisham on her wrongful foreclosure claim because Grisham failed to prove the absence of Bank's

right to foreclose in light of the fact that Grisham had defaulted on numerous loans, prompting Bank's exercise of its right to foreclose under the 5th Deed of Trust. We agree.

■ "The commencement of a foreclosure of a deed of trust cannot be wrongful when there is a clear right to foreclose." *Holm v. Wells Fargo Home Mortg., Inc.*, 514 S.W.3d 590, 598 (Mo. banc 2017) (quoting *Loeb v. Dowling*, 349 Mo. 674, 162 S.W.2d 875, 877 (1942)). "To maintain a tort action for damages for wrongful foreclosure, a plaintiff must 'plead and prove that when the foreclosure proceeding was begun, there was no default on its part that would give rise to a right to foreclose.'" *Id.* (quoting *Dobson v. Mortg. Elec. Registration Sys., Inc./GMAC Mortg. Corp.*, 259 S.W.3d 19, 22 (Mo. App. E.D. 2008)). "While the 'improper execution of a rightful foreclosure' may be sufficient grounds for an equitable claim to set aside the sale, damages at law for wrongful foreclosure are ... available [only] when 'the foreclosure was absolutely void because the mortgagee had no right to foreclose at the time he attempted foreclosure.'" *Id.* (quoting *Peterson v. Kan. City Life Ins. Co.*, 339 Mo. 700, 98 S.W.2d 770, 774 (1936)).

■ Here, in seeking damages for an alleged wrongful foreclosure, it was Grisham's burden to both plead and prove the absence of a default entitling Bank to foreclose. But Grisham neither pled the absence of a default nor made any effort to prove its absence.[11] And the record plainly

---

10. Grisham never challenged the cross-collateralization provision, and such provisions are routinely enforced in Missouri. *See Russell v. Empire Storage & Ice Co.*, 332 Mo. 707, 59 S.W.2d 1061, 1070 (1933) (holding that "[s]uch provisions are valid."); *In re Cook*, 504 B.R. 496, 503 (Bankr. App. 8th Cir. 2014) ("Missouri courts have been more hospitable to 'dragnet clauses' than neighboring states and are more likely to enforce them.").

11. Though Grisham technically pled that, "[a]t the time when [Bank] commenced ... foreclosure no default existed," the basis for her assertion was that she "had made [a] request for payoff" and, through a potential sale, would have been "capable of *curing any default* and satisfying the Deeds of Trust in full." (Emphasis added.) In pleading that she had the capability of curing the default, Grisham implicitly acknowledged its existence.

indicates not only that a default existed but also that Grisham repeatedly acknowledged and affirmed its existence through the Forbearance Agreement and its subsequent amendments.

Grisham argues, however, that Bank is not entitled to relief on this point for three reasons: (1) "Bank did not convince the court the loan was in default"; (2) "a default is not an absolute prohibition to recovery for damages, because the issue is the right to foreclose"; and (3) "Bank's wrongful act extrinsic to the sale overrides Bank's right to foreclose." None of these arguments are availing.

▮ First, it was *not* Bank's burden to plead or prove a default. "Generally, the party not having the burden of proof on an issue need not offer any evidence concerning it." *White v. Dir. of Revenue*, 321 S.W.3d 298, 305 (Mo. banc 2010) (quoting *Stiff v. Stiff*, 989 S.W.2d 623, 628 (Mo. App. S.D. 1999)). Instead, as the party seeking relief for an alleged wrongful foreclosure, it was Grisham's burden to both "plead and prove that when the foreclosure proceeding was begun, there was no default on [her] part that would give rise to a right to foreclose." *Fields v. Millsap & Singer, P.C.*, 295 S.W.3d 567, 571 (Mo. App. W.D. 2009). There are no facts in the record suggesting an absence of default; on the contrary, the evidence showed only that a default existed, that Grisham acknowledged the default and entered into a forbearance agreement with Bank, and that the debts leading to the default were never satisfied. Thus, even if Bank did bear the burden (which it did not), it would have easily met that burden.

▮ Grisham further argues that the existence, or lack thereof, of a default was a factual matter and, under our standard of review, we must assume its non-existence in accordance with the trial court's judgment. But, here, the existence of a default giving rise to foreclosure was uncontested. "Evidence ... is uncontested when a party 'has admitted in its pleadings, by counsel, or through the [party's] individual testimony the basic facts of [the other party's] case.' " *White*, 321 S.W.3d at 308 (quoting *All Am. Painting, LLC v. Fin. Solutions & Assocs., Inc.*, 315 S.W.3d 719, 723 (Mo. banc 2010)). As noted, Grisham repeatedly acknowledged the default giving rise to Bank's right to foreclose through her sworn statements in the Forbearance Agreement and its amendments. "In such cases, the issue is legal, and there is no finding of fact to which to defer." *Id.*

Grisham's second and third arguments are likewise unavailing. She insists that the focus is on the right to foreclose and not the existence of a default. She claims that, even where there is a default, a lender may not have the right to foreclose under certain circumstances, and if it proceeds anyway, the foreclosure is wrongful. Grisham then argues that Bank engaged in wrongful acts by refusing to provide a payoff letter and refusing to accept Grisham's purported tender; she claims that these wrongful acts deprived Bank of the right to foreclose. At best, Grisham's allegations involve "the improper execution of a rightful foreclosure." *See Peterson*, 98 S.W.2d at 774. While such allegations may have supported an equitable claim of wrongful foreclosure, Grisham's claim was one at law and not equity.[12]

---

12. Though we need not reach the issue, we doubt that the alleged wrongful conduct was, in fact, wrongful at all. In Point II, Bank argues that the court erred in finding that its failure to provide a payoff letter, as contemplated by Grisham, was wrongful. In Point III, Bank argues that the court erred in finding that Bank wrongfully refused Grisham's purported tender. And in Point IV, Bank argues that the court erroneously construed the contracts as permitting Grisham to discharge all of her debt by paying only the secured portion thereof.

Grisham's intent in both requesting a payoff letter and purportedly offering tender was to

"The term 'wrongful foreclosure' has been used both in suits in equity as a basis for setting aside a sale and in suits at law as a basis for recovering tort damages." *Fields*, 295 S.W.3d at 571. "However, what constitutes a 'wrongful foreclosure' sufficient to set aside a sale and what constitutes a 'wrongful foreclosure' sufficient to recover damages in tort are not the same." *Id.* at 571-72 (quoting *Dobson*, 259 S.W.3d at 22). "A plaintiff seeking damages in a wrongful foreclosure action must plead and prove that when the foreclosure proceeding was begun, *there was no default on its part that would give rise to a right to foreclose.*" *Dobson*, 259 S.W.3d at 22 (emphasis added). "A plaintiff must 'plead and prove such compliance with the terms of the deed of trust as would avoid lawful foreclosure.' " *Id.* (quoting *Spires v. Lawless*, 493 S.W.2d 65, 71 (Mo. App. 1973)). *"While the mortgagee's alleged wrongful acts may be sufficient to quiet title or set aside a sale, damages may not be recovered for wrongful foreclosure where the plaintiff fails to show that it was not in default." Fields*, 295 S.W.3d at 572 (emphasis added).

In short, because Grisham sought damages at law for an alleged wrongful foreclosure, it was her burden to both plead and prove the absence of a default on her part entitling Bank, under the terms of the 5th Deed of Trust, to exercise a right to foreclose. But she failed to meet this burden and, in entering judgment in her favor, the trial court misapplied the law.

Point I is granted.

**C. Grisham, as the first party to breach, was not entitled to relief on her claim for breach of contract (Bank's Point V).**

In its fifth point on appeal, Bank argues that the trial court erroneously applied the law in allowing Grisham to recover on her breach of contract claim insofar as (1) Bank's demands for payment and failure to provide a payoff letter as contemplated by Grisham did not constitute breaches of

---

secure a commitment from Bank that, if she paid the balance owed, Bank would release the various deeds of trust. In response to Grisham's requests for a payoff letter, Bank provided Grisham with a letter identifying all of her outstanding indebtedness to Bank. Though Bank refused to provide the kind of letter contemplated by Grisham, its refusal was perfectly justified. Because the various deeds of trust secured future advances and future obligations, payment in full of the indebtedness would not have required Bank to release the deeds of trust as Grisham suggests. The same is true of the purported tender. Setting aside the fact that the purported tender of $500,000 would have been insufficient to satisfy the secured obligations, even if it had, Bank would not have been required to release the deeds of trust. Grisham first needed to give Bank the notice provided for in § 443.055.6 to cancel the effect of the future advances and future obligations provision. Only after providing such notice would she have been entitled to a release upon payment in full.

And payment in full under the facts here would have required well in excess of the $500,000 Grisham purportedly tendered. Again, it appears that there was a fundamental misunderstanding regarding the operation of the maximum lien provision in the 5th Deed of Trust. Put simply, this provision is not a limit on liability for the debtor. The maximum lien provision does nothing more than identify the maximum amount of principal secured by the collateral at any given time on the underlying obligation. But the total amount of debt secured may well exceed that amount, as is the case here. And, in any event, payment of $500,000 would not have eliminated the secured principal amount, as Bank was allowed—under the terms of the Forbearance Agreement—to apply payments in any manner it saw fit; in other words, Bank would have applied that payment to reduce the outstanding indebtedness on interest, not principal. Thus, even if Bank had accepted Grisham's tender, the 5th Deed of Trust would still have secured $500,000 in principal, as Grisham owed Bank over $3 million, all of which was secured by the 5th Deed of Trust.

contract; and (2) as the first party to breach, Grisham was not entitled to bring a breach of contract claim. We agree.

Grisham's breach of contract claim was premised on an alleged violation of the "Right to Cure" provision of the 5th Deed of Trust. That provision provided:

If any default, other than a default in payment is curable and if Grantor has not been given a notice of a breach of the same provision of this Deed of Trust within the preceding twelve (12) months, it may be cured if Grantor, after [Bank] sends written notice to Borrower demanding cure of such default: (1) cures the default within twenty (20) days; or (2) if the cure requires more than twenty (20) days, immediately initiates steps which [Bank] deems in [Bank's] sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

Grisham argued that she attempted to cure the default by requesting payoff letters and offering her purported tender of $500,000. She claims that, by not issuing a payoff letter or accepting her tender, Bank precluded her efforts to cure to which she was entitled under the 5th Deed of Trust.

As noted above, because the 5th Deed of Trust contained provisions for future advances and future obligations, a reduction of the underlying indebtedness to zero would not have mandated release of the 5th Deed of Trust by Bank, and nothing in the 5th Deed of Trust suggested otherwise. Thus, Bank's refusal to provide a payoff letter guaranteeing release of the 5th Deed of Trust upon payment of any particular amount did not constitute a breach of contract, as doing so was never among Bank's obligations under the plain language of the 5th Deed of Trust. Additionally, refusing Grisham's purported tender was also not a breach, as a payment of $500,000 on indebtedness in excess of $3 million would not have cured Grisham's default.

■ In any event, Grisham should not have been allowed to pursue this claim, as it is a "well[-]settled principle that a party to a contract cannot claim its benefit where [s]he is the first to materially breach it." *Guengerich v. Barker*, 423 S.W.3d 331, 339 (Mo. App. S.D. 2014).

■ "[D]eeds of trust are subject to generally applicable rules of contract construction." *Central Bank of Kan. City v. Perry*, 427 S.W.3d 285, 288 (Mo. App. W.D. 2014). "The first step in interpreting a contract is to 'ascertain the intent of the parties by looking at the words of the [contract] and giving those words their plain, ordinary and usual meaning.'" *Id.* (quoting *Melson v. Traxler*, 356 S.W.3d 264, 270 (Mo. App. W.D. 2011)). And "[t]he intent of the parties is determined based on the [contract] alone unless the contract is ambiguous." *Id.* (quoting *Melson*, 356 S.W.3d at 270).

■ Grisham has never argued that the 5th Deed of Trust was in any way ambiguous regarding the future advance/obligation provisions, the identification as to what constituted events of default, or Bank's rights and remedies upon default. On the contrary, Grisham expressly and repeatedly acknowledged defaulting on the underlying obligations secured by the 5th Deed of Trust, which provided that one kind of default event was the "[f]ailure to comply with any . . . term, obligation, covenant or condition contained in this Deed of Trust, the Note or in any of the Related Documents." Thus, Grisham has admitted her own breach of the 5th Deed of Trust. And the conduct that Grisham alleges constituted a breach of the 5th Deed of Trust by Bank—though not actually constituting a breach—did not occur

until well after Grisham's initial admitted breach of her own. Accordingly, as the first party to breach the 5th Deed of Trust, Grisham cannot now claim its benefit by pursuing a claim against Bank for breach of contract under the Right to Cure provision.[13]

Point V is granted.

**D. Because the dispute was governed by an express contract, Grisham was not entitled to relief on her claim for unjust enrichment (Bank's Point IX).**

In its ninth point on appeal, Bank argues that the trial court misapplied the law in entering judgment for Grisham on her unjust enrichment claim insofar as the court failed to require Grisham to prove that Bank obtained a benefit under inequitable circumstances independent of Bank's rights under an express contract, and the only benefit Bank obtained was that to which it was entitled through the lawful exercise of its right to foreclose under the terms of the 5th Deed of Trust. We agree.

"A claim for unjust enrichment has three elements: a benefit conferred by a plaintiff on a defendant; the defendant's appreciation of the fact of the benefit; and the acceptance and retention of the benefit by the defendant in circumstances that would render that retention inequitable." *Hertz Corp. v. RAKS Hosp., Inc.*, 196 S.W.3d 536, 543 (Mo. App. E.D. 2006).

Here, Grisham alleged that, "[i]n exchange for [Grisham's] full payment of the sums secured by each such Deed of Trust, [Bank] agreed and promised to release [Bank's] lien(s) on the Property." She further alleged that she had "offered tender of full payment and performance, but [Bank] ha[s] failed and refuse[d] to release [Grisham's] property," and, "[a]s a result

of [Bank's] refusal to allow [Grisham's] tender, [Bank] has captured [Grisham's] Property including the equity in [Grisham's] property." Grisham concluded that "[i]t would be inequitable and unjust to allow [Bank] to fail to honor [its] promises and to capture the equity interest in [Grisham's] Property."

Again, Grisham's allegations and theory were based upon a fundamental misunderstanding of how the 5th Deed of Trust operated. Because it was a future advance deed of trust, release of the lien was not an automatic consequence of full payment of the secured indebtedness. And, despite her claims to the contrary, there is nothing in the plain language of the 5th Deed of Trust indicating that a release would be forthcoming upon payment in full in the absence of Grisham first exercising the statutory notice provided in § 443.055.6 to cancel the effect of the future advance/obligation provision. Her argument was also premised on a misunderstanding of the nature of the secured debt itself insofar as she relied upon the maximum lien provision as a limit of liability for herself as the debtor. But, as discussed *supra*, that is not the purpose or effect of the maximum lien provision. Furthermore, in light of the cross-collateralization provision of the 5th Deed of Trust, securing *all* of the indebtedness owed by Grisham to Bank (an amount exceeding $3 million), there was no remaining equity in Grisham's property for Bank to capture, unjustly or otherwise.

In any event, "[i]t is a well-settled principle of law that implied contract claims [such as unjust enrichment] arise only where there is no express contract." *Lowe v. Hill*, 430 S.W.3d 346, 349 (Mo. App. W.D. 2014). "Accordingly, a

---

13. In any event, the Right to Cure provision is limited, by its own terms, to defaults "other than a default in payment." Because Grisham's initial default was due to a default in payment, it appears that any right to cure she may have otherwise had under this provision was not available to her.

plaintiff cannot recover under an equitable theory when she has entered into an express contract for the very subject matter for which she seeks to recover." *Id.* Instead, "the plaintiff's rights are limited to the express terms of the contract." *R & R Land Dev., L.L.C. v. Am. Freightways, Inc.*, 389 S.W.3d 234, 243 (Mo. App. S.D. 2012) (quoting *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. App. W.D. 2010)). Here, the 5th Deed of Trust, by its plain terms, secured all indebtedness owed by Grisham to Bank, it defined events of default, and it provided rights and remedies—including non-judicial foreclosure—for default. Thus, it expressly governed the subject matter at issue in Grisham's unjust enrichment claim and, thereby, bars her from obtaining relief.

Point IX is granted.

### E.  Remaining Points

In light of our resolution of Points I, V, and IX, we need not address Bank's remaining points on appeal related to the alleged wrongful nature of its conduct or the damages calculated and imposed by the trial court.

### Conclusion

The trial court erred in entering judgment in Grisham's favor on her claims for wrongful foreclosure, breach of contract, and unjust enrichment. Its judgment is reversed, and the case is remanded for further action consistent with this opinion.

Thomas H. Newton, Presiding Judge, and James Edward Welsh, Judge, concur.